J-A13039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.F.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| M.A.D. | : | |
| | : | |
| Appellee | : | No. 1852 EDA 2021 |

Appeal from the Order Entered August 10, 2021
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 2007-26322

MEMORANDUM PER CURIAM:                    **FILED SEPTEMBER 16, 2022**

Appellant, J.F.D. ("Father"), appeals *pro se* from the order entered in the Montgomery County Court of Common Pleas, which modified the custody agreement between Father and Appellee, M.A.D. ("Mother"), as it relates to their minor children, B.D. and P.D. ("Children"). We affirm.

In its opinion, the trial court set forth the relevant facts and procedural history of this case as follows:

> [Father and Mother] have two daughters born during their marriage: [B.D., born in 2006, and P.D., born in 2008] (collectively referred to as "minor children"). The parties were married on December 30, 2005, separated on March 20, 2012 and officially divorced on September 13, 2018.
>
> The parties have been embroiled in litigation for over a decade, covering most of the minor children's entire lives. The parties are routinely heard on numerous pleadings including, but not limited to, Petitions to Modify, Petitions for Contempt, Emergency Petitions and Petitions for Protection from Abuse.
>
> It is worth noting that the instant matter tracks closely with

the protracted custody proceedings conducted before the [trial court] in 2017. At that time, on August 31, 2017, the [c]ourt issued comprehensive Findings of Fact consisting of twenty-two (22) pages with an accompanying Order of seventeen (17) Pages.

The 2017 Order represented a significant change from the joint legal and the 50/50 physical custody schedule the parties had been observing pursuant to a 2013 Order and highlighted significant concerns with regard to Father's behavior. The aforementioned 2017 Order provided Mother with sole legal custody and primary physical custody with Father having alternate weekends (Friday through Sunday) and one day during the week from 4-7 PM. Notably, the [trial court] warned that Father's continued efforts to isolate and turn the children against their own Mother were as if he was carefully planting the "seeds of alienation."

Notwithstanding Father's behavior at that time to alienate the children from Mother, the [trial court] noted the following:

> Father's role in the process [*i.e.* legal custody] can be resumed at some point in the future provided that there is demonstrated improvement on his ability to co-parent without the constant need to prove Mother wrong at each turn, imposing judgmental opinions that are not productive to the process, and thriving on producing conflict in the presence of third party professionals; all of which are not in the best interest of the children.

Father appealed the [trial court's] August 31, 2017 Order raising twelve (12) issues on appeal. On June 13, 2018, the Superior Court of Pennsylvania affirmed the [trial court's] Order…

[T]he parties continued to heavily litigate, not only in custody, but also in Equitable Distribution, Protection from Abuse and other various motions and pleadings.

On February 8, 2019, following an incident that occurred at the children's school where Mother's alcohol use was at issue, the [trial court] ordered Mother to enroll in Soberlink,

a remote alcohol monitoring program. The Order was to ensure the safety of the children as it related to any allegation made regarding Mother's alcohol use and driving. The Soberlink program requires that the user designate a "concerned party," such that any requested changes to the program had to be signed off on by the concerned party. The program further required that there be "involved parties," such that all test results by the user would notify the involved parties. Mother designated her adult son, Logan Visavati, as her "concerned party," and Father and the [Montgomery Child Advocacy Project attorney who had been appointed as a guardian *ad litem* for the children] as involved parties.

Thereafter, on or about March 2019, Mother and her concerned party requested that the Soberlink positive BAC threshold be raised from the default zero tolerance to a positive BAC threshold setting of 0.020% (based on her belief that the default zero setting was too sensitive and was providing inaccurate test results). Soberlink accommodated the request upon receiving the signed request forms from both Mother and her concerned party. When the changes were questioned by Father and his then attorney during the 2020 custody proceedings, in order to ensure full disclosure and transparency, the [trial court] entered an Order on February 24, 2020 detailing the aforementioned changes.

Father subsequently agreed to a custody Order on that same date, February 24, 2020. The February 24, 2020 Order restored Father's joint legal custody, added an overnight on the Sunday of Father's alternate weekends and added an overnight visit during the week (an increase of 6 overnights a month overall). It also provided an avenue for Father to improve his co-parenting relationship such that a 50/50 physical custody schedule could resume at the beginning of the 2020-21 academic school year. Notably, neither Father nor his legal counsel included in the Agreed Order any concern or request to change the BAC threshold back to a zero tolerance threshold.

Father did not make any effort to improve the co-parenting relationship and instead, continued to chart his path of contentious litigation, leading to his October 9, 2020 Emergency Petition to Modify—the basis for the instant

- 3 -

appeal. As opposed to working towards a 50/50 schedule, as anticipated, Father instead sought to effectively shut Mother out completely; requesting "full legal and 100% physical custody."

Furthermore, in an ironic projection of his own faults and issues, Father alleged that it was Mother who is alienating the children from Father, that it was Mother who is creating conflict at every turn, and that it was Mother who is placing the children in "imminent danger." Consistent with Father's theme for total and full control, he requested that the minor children "have a break from Mother, [the] court, and its court-ordered professionals."

On June 8, 2020, upon review of an Emergency Petition filed by Mother, the [trial court] discovered that the therapy for the children, specifically directed in the 2017 Order, was not occurring and proceeded to enter an Order directing therapy to be resumed "forthwith."

On October 19, 2020, upon learning from the minor children's therapist, Kristine Kershner, that neither of the children were attending therapy as previously ordered in the August 31, 2017 Order **and** June 8, 2020 Order, the [trial court] proceeded to issue a Rule to Show Cause upon both parties to show why the [c]ourt should not find them in contempt.

After Father filed his Emergency Petition to Modify on October 9, 2020, the parties appeared…for a Triage Conference on December 11, 2020 and were then scheduled for a two-day protracted hearing before the [trial court] on February 2 and 3, 2021. Both Rule's to Show Cause were also consolidated with Father's Emergency Petition to Modify for the two day protracted hearing.

Notably, the Scheduling order…directed that "[o]nly relevant evidence since the 2/24/20 Agreed Order shall be admitted into the trial." Despite the Order limiting the parties to relevant evidence post February 24, 2020, Father proceeded to submit proposed exhibits numbering close to 1,000 pages in the [c]ourt's "drop box."

The first day of hearings began on February 3, 2021. The

first half of the first day of testimony was directed to the children's therapist Kristine Kershner. In general, the therapist testified that the children were initially going to the scheduled appointments, but as soon as the alternating weekly summer schedule started in June with Father, they began to refuse attendance and Father did not bring them in for sessions. Ms. Kershner clarified that the children's refusal to attend was due to their belief that they did not need to attend therapy anymore and that they "no longer trusted the therapist." Additionally, Ms. Kershner testified to Exhibits "M-1" through "M-3" and conveyed the following:

> [P.D.] began re-attending consistently on June 5, 2020, upon order of the court. At that time, increased visitation began to occur with her father, with [P.D.] and her sister reportedly spending alternate weeks with her father. During this time, there was notable clinical change in [P.D.] She became increasingly resistant to attend therapy, stating that she no longer wanted to attend because therapy was causing her a great deal of stress. During [three sessions] she indicates that she wants to stop therapy. When asked to explain her reasons, she shares each time that therapy is very stressful because it is causing her parents to argue more. **She states her father does not want her to attend therapy and her mother does, as a result they fight**… In addition to this increased resistance to attending therapy, [P.D.] also began to exhibit an increase in negative attitude and behavior toward her mother. This was concerning, as [P.D.] had been working very hard to improve her relationship and communication with her mother prior to this. This had been a focus of her therapy, at her request…

When it was Father's turn to elicit testimony, Father chose to spend much of his time questioning the therapist about the format of the therapy sessions and alleged communication between himself and the therapist. …Father continues to view litigation and accompanying therapy as a means to persuade the court and treating professionals that he is "the end all, be all" for the children's well-being…[.]

\* \* \*

Father has steadfastly, if not stubbornly, maintained that pattern of behavior wherein he believes himself more capable of handling issues for the children despite what any court, therapist, or doctor provides. Just as Father exhibited his sense of entitlement and arrogance before Dr. Bellettirie and Dr. Cooke in the 2017 proceedings, Father has since continued to do so with new treating professionals.

Dr. Donna Tonrey was appointed to provide co-parenting therapy for the parties in order to improve their co-parenting relationship on August 9, 2019 after a succession of several other notable mental health professionals in the region. In her letter report dated December 5, 2019 [she stated]:

> After the overall experience, and in particular the last session with [Father] on November 1, 2019, I do not believe that any amount of therapy or therapeutic interventions will make a difference with [Father] cooperating with co-parenting. In my experience of working with [Father] and [Mother], [Father] did not demonstrate a regard for the opinion, viewpoint, or authority of others involved in resolving this situation. … From my experience in these sessions, I am not confident that [Father] was intent on taking responsibility for the impact that his words and actions have on effective co-parenting. I do know both [Father] and [Mother] contribute to the situation, however, [Mother] does appear to have a willingness to take responsibility for the impact her words and actions have on co-parenting.

Father has made it clear that any professional who disagrees with his perspective will either be bullied to the point of quitting, be fired, replaced, or can no longer be trusted.

When it was Father's turn to testify following Ms. Kershner's testimony, considerable time was expended while Father went through the alleged missed Soberlink tests[,] walking through each month on Father's self-created Calendar Exhibit, and providing Father ample time to give his version of Mother's "missed tests."

Following the first day of testimony, Father continued his litigation strategy to wear down the court and opposing counsel with the additional filings of pleadings including a twenty-nine (29) page Motion *in Limine* (447 pages including attachments) and a sixty-eight (68) page "Statement in Lieu of Testimony" (374 pages including attachments). In both pleadings, Father sought to introduce essentially a full history of his version of the parties' lives both prior to the Agreed Order of February 24, 2020 and after. Specifically, Father attempted to use his Motion *in Limine* to introduce allegations of Mother's alcohol use prior to the Agreed Order of February 24, 2020; and his "Statement in Lieu of Testimony" as an effort to put evidence into the record that he failed to testify about during the hearing.

The [trial court] scheduled the parties for a second day of testimony on March 15, 2021, consolidating Father's Motion *in Limine*. Following argument on the Motion *in Limine*, the [trial court] took the Motion under advisement and Father was then directed to finish his direct testimony. Instead, Father opted to use the time set aside for his direct to argue with the [c]ourt over the validity of admitting his voluminous "Statement in Lieu of Testimony." Having cited no legal authority upon which to enter such a statement into the record, the [trial court] denied Father's request.

After some further redirection, Father finally resumed his direct testimony. During his direct testimony Father repeatedly testified that he is the minor children's "first line of defense" and that he [did not] feel it was necessary to reach out to the professionals when he credits himself as someone who can handle it on his own. As indicated in the [trial court's] August 31, 2021 Findings, Father showed a complete unwillingness to support therapy for children. On the contrary, he encouraged them not to participate, refused to transport them to scheduled therapy appointments during his custodial time and, worst of all, shared the contents of progress letters the therapists had provided to the [c]ourt with the children. By sharing the contents of the therapist's letters, a self-serving and destructive act, Father successfully undermined any rapport that the therapists worked to build with the children, all while convincing the children, over and over again, that the

- 7 -

therapists cannot be trusted.

Father also remains oblivious that some of his conduct strains the relationship between the two minor children….

* * *

By the conclusion of the second scheduled day of testimony, Father had effectively been given one and a half days to testify, through both direct and cross examination.

Having still not heard any testimony from Mother, the [trial court] scheduled a third day of testimony on May 17, 2021. In addition, the [trial court] granted, in part, Father's Motion *in Limine* such that Father could present limited testimony/evidence concerning Mother's alleged substance abuse from January 1, 2019 to date…. The [trial court] also granted Father's request to have a representative from Soberlink testify and for the representative to provide [the trial court] with the entire file that Soberlink maintained for the parties['] matter.

Recognizing the concurrent emotional and additional behavioral issues that the children were experiencing throughout this litigation, and the testimony from Ms. Kershner that it was not realistic for her to continue, the [trial court] directed that the children begin therapy with Dr. Heather Green on March 22, 2021….

The [trial court] also entered a separate six-page Order on March 22, 2021 appointing additional mental health professionals to treat specific behavioral issues for each child as the parties had been paralyzed by indecision on the selection of professionals for many months.

Before the third day of testimony began, Father filed yet another Motion—a Motion for Reconsideration of the Motion *in Limine*—which was consolidated with the hearing on May 17, 2021.

Mother finally had her opportunity to testify on May 17, 2021. In sum, Mother testified to Father's refusal to follow court orders and how he allows the children to do what "they believe is right" as opposed to what a court order says.

Mother stated that it was her impression that Father instilled in the children that they have the choice do to what they want to do, instead of what Mother, the court, or any treating professional may tell them. Father has gone to extensive effort to convince the children that they do not have to do what they are told so long as they "do what's right." As further evidence of Father's disregard of Mother, the [trial c]ourt, and the treating professionals, on the February 23, 2021 CHOP Intake Questionnaire for [B.D.], Father lied in reporting that documentation of the child's legal custody arrangements "[did] not apply."

In contrast to Father's attitude toward the treating professionals, Mother testified that she has been working with therapists on how to better parent and what to do when the children become defiant and purport to be in charge.

Finally, Mother provided her own Exhibit regarding the alleged missed Soberlink tests, with accompanying emails and supporting documentation, and testified that the alleged missed tests directly correlated to dates when the children were in Father's custody or were only missed by minutes (to which she followed up with a compliant test). Mother showed that she had not failed **any** Soberlink tests since March 1, 2020, that the children are obsessed with the testing, and asserted that further use of the Soberlink device would continue to be destructive and unproductive.

At the conclusion of the third day, the [trial court] scheduled a fourth day of testimony to enable the representative from Soberlink to testify on June 8, 2021.

On June 7, 2021 (one day before the fourth and final day of testimony), in typical fashion to remove anyone who disagrees with him, Father filed a "Petition for Special Declarative Relief and to Disqualify the Honorable Daniel J. Clifford." Father alleged that the [trial judge] was [not] impartial and should be considered a material witness to the parties' case due to the [trial judge's] remarks that the [c]ourt was of the impression that the parties had entered into an agreement following the BAC threshold change in Mother's Soberlink program. Notwithstanding Father's efforts to delay the conclusion of the proceedings, the June 8, 2021 date to allow the Soberlink representative to testify

- 9 -

remained as scheduled and both Father and Mother's counsel had ample opportunity to ask questions.

As ordered, Soberlink also provided [the trial court] and the parties with their complete file….

Despite Father's fishing expedition to find fault in Mother's Soberlink tests, three things were notable from the testimony of the Soberlink representative: (1) The representative testified that while he recognized that tampering does happen from time to time, that has not happened in this case; (2) Soberlink can identify and evaluate a series of positive tests to detect if the results have been compromised, but looking at the data, nothing appeared wrong with the results; (3) on average, a Soberlink client would utilize the device for four months. Mother had been using the Soberlink device for over two years, an extremely uncommon time period for any parent in a custody case according to the Soberlink representative.

At the conclusion of the Soberlink representative's testimony, Father and Mother's counsel were given an opportunity to present closing argument and directed to submit their own proposed findings with regard to the custody factors in Pa.C.S.[A.] § 5328(a) by June 23, 2021. The [trial court] made arrangements for the child interviews to occur the next day, June 9, 2021, while the children were at school, in a neutral setting, via Zoom. The parties were directed to present areas of inquiry to address with the children to Chambers, in advance, to enable their participation in the interviews.

A complete review of the children's interviews was contained in the August 9, 2021 Findings of Fact. The children's preference during the interview was not "well-reasoned." The children's behavior could best be described as a desperate effort to satisfy their Father's "agenda," excluding Mother and placing him as the martyr for the family's issues and concerns. As a result, the [trial court] placed reduced weight on the children's testimony, especially in light of the inescapable alienation at play.

On June 11, 2021, the [trial court] denied Father's Motion for Reconsideration, filed on May 5, 2021. There was no

- 10 -

> need for additional testimony as Father was provided with ample time to present his case within the four days of hearings and, furthermore, he was given the opportunity to make closing argument and submit written Findings of Fact. Lastly, having no basis in which the [trial judge] would be called as a "witness" in the matter, and thus lacking any foundation, Father's Petition for Declarative Relief and to Disqualify the Honorable Daniel J. Clifford was denied on June 16, 2021.
>
> Within a month after the record closed, and before the [trial court] could issue [its] August 9, 2021 Order and accompanying Findings of Fact, Father filed an Emergency Petition to Modify on July 6, 2021 and an Emergency Petition for Special Relief on July 22, 2021, repeating nearly identical allegations as had just been testified to during the four (4) days of testimony….

(Trial Court Opinion, 10/12/21, at 1-17) (footnotes, internal citations, and some quotation marks omitted; emphasis in original).

By order dated August 9, 2021 (and filed August 10, 2021), the trial court issued a custody order granting Mother sole legal and primary physical custody of Children. The court granted Father partial physical custody consisting of every other weekend and, on the Tuesday following and Thursday preceding Mother's weekend, custody from after school through 7:00 PM. On September 9, 2021, Father timely filed a notice of appeal and a contemporaneous concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises the following issues for our review:

> I. Did the trial court err as a matter of law and/or committed an abuse of discretion by failing to fulfill its obligation and responsibility to create a complete record in a custody case so that a comprehensive review can be conducted on appeal

as follows:

a. By refusing to allow Father to submit into evidence the complete history of Mother's alcohol abuse so as to understand the severity of her problem?

b. By refusing to allow Father to submit evidence and testimony he sought to introduce that was relevant to the issue of custody and not duplicative, including evidence pertaining to Mother's substance, physical and emotional abuses of the children, from May 24, 2017 to February 24, 2020?

c. By refusing to allow Father to submit evidence and testimony pertaining to 14 of the 16 custody factors, from February 24, 2020 to present, because Father's time for testimony and evidence expired according to the [c]ourt's artificial time clock?

d. If time was truly of the essence, then the [t]rial [c]ourt erred when it precluded Father from submitting a written statement in lieu of oral testimony that would have been subject to cross-examination because the [t]rial [c]ourt's manufactured time restraints effectively rendered Father an unavailable witness pursuant to Pennsylvania Rule of Evidence 804?

e. By limiting Father's questioning of the Soberlink witness and by refusing to admit both parties' communication with Soberlink, which would have disclosed Mother's frequent attempts to circumvent Soberlink procedures and deceive the [c]ourt?

f. By limiting Father from testifying on redirect after being cross-examined by Mother's counsel and thereby, blocking Father's right to rehabilitate his testimony?

g. By repeatedly stating on the record, that he "has presided over numerous protracted proceedings involving the parties over the past 5 years including, but not limited to, custody and PFA's (as recently as 2020 and 2019 respectively) and, as a result, is

extremely aware of the cumulative history of the case," which position essentially insulates the [t]rial Judge from appellate review because what is in the [t]rial Judge's memory is not part of the record, and as a result, the [t]rial [c]ourt excluded relevant evidence occurring over more than four (4) years of the children's lives?

II. Did the trial court err as a matter of law and/or committed an abuse of discretion in relying on an *ex parte* letter submitted to the [c]ourt by the children's therapist, Dr. Green, without giving Father the opportunity to cross-examine the therapist and/or even have access to the letter?

III. Did the trial court err as a matter of law and/or committed an abuse of discretion in denying summarily Father's Petition for Declaratory Relief and to Disqualify the [t]rial Judge and that was docketed on June 7, 2021, especially when the record does not support the conclusion there was an agreement regarding Mother's unilateral alteration to the Soberlink Device threshold?

IV. Did the trial court err as a matter of law and committed an abuse of discretion when it terminated Mother's obligation to continue to use the Soberlink Device, especially given the evidence of record that Mother unilaterally increased the threshold for alcohol detection making her negative tests meaningless and in so doing, ignored the children's safety?

V. Did the [t]rial [c]ourt err as a matter of law and/or committed an abuse of discretion when it failed to give considerable weight to Mother's alcohol abuse and thereby avoided analyzing factors that should have been given weighted consideration pursuant to 23 Pa.C.S.A. § 5328(a)?

VI. Did the trial court err as a matter of law and/or committed an abuse of discretion in granting Mother the sole discretion to name a third party for the children to contact regarding Mother's drinking and driving, especially when the record was clear that Mother would name her adult son, and that Father had legitimate concerns about the adult son's ability to manage Mother's drinking?

VII. Did the trial court err as a matter of law and/or committed an abuse of discretion in not asking the children critically relevant questions provided by Father to the [c]ourt as per its June 8, 2021 request, and in dismissing the credible concerns and reasonable preferences of the children?

VIII. Did the trial court err as a matter of law and/or committed an abuse of discretion in making credibility determinations for Mother and Father that are not supported by the record and which appear to be a blatant attempt by the [t]rial [c]ourt to render its decision impervious to review on the issue of credibility alone?

IX. Did the trial court err as a matter of law and/or committed an abuse of discretion in making numerous Findings of Fact that are not supported by the record, including but not limited to the finding that Father allegedly engaged in conduct to alienate the children from Mother despite the abundance of evidence in the record that the children are estranged from Mother and want to reside with Father as a result of Mother's abuse of the children and her inability to function as a parent due to her alcohol abuse?

X. Did the trial court err as a matter of law and/or committed an abuse of discretion in denying Father's Motion for Reconsideration despite the [c]ourt's May 11, 2021 Order to hear arguments for the same?

XI. Did the trial court err as a matter of law and/or committed an abuse of discretion in finding Father in contempt of the Orders dated June 8, 2020, the Agreed Order of February 24, 2020 and section 5(f) of the March 22, 2021 [order], especially since Mother does not have clean hands with respect to the Orders of Custody and participation in therapy?

XII. Did the trial court err as a matter of law and/or committed an abuse of discretion in rendering a decision that is based on its ill will and bias towards Father, which is palpable in the record, rather than what is in the best interests of the children?

- 14 -

XIII. Did the trial court err as a matter of law and/or committed an abuse of discretion in granting Mother sole legal custody of the children when the record is replete with incidents of Mother's poor judgment regarding the children, including but not limited to those occasions where Mother elected to consume alcohol to excess when with the children and to endanger the children's safety by driving a vehicle with the children inside after imbibing alcohol?

(Father's Brief at 10-20) (issues renumbered).

In reviewing a child custody order:

[O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.J.S. v. M.J.S.*, 76 A.3d 541, 547-48 (Pa.Super. 2013) (internal citation omitted). This Court has consistently held:

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa.Super. 2006) (internal citation omitted). In addition:

- 15 -

> Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*M.A.T. v. G.S.T.*, 989 A.2d 11, 18-19 (Pa.Super. 2010) (*en banc*) (internal citations omitted).

"With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child." *M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa.Super. 2013), *appeal denied*, 620 Pa. 710, 68 A.3d 909 (2013) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa.Super. 2011)). Section 5328(a) sets forth the best interest factors that the trial court must consider in awarding custody:

### § 5328. Factors to consider when awarding custody

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a

- 16 -

continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a)(1)-(16).

After a thorough review of the certified record, the briefs of the parties, the relevant law, and the well-reasoned opinion of the Honorable Daniel J. Clifford, we conclude Father's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion at 20-54) (finding: (1) Father had ample opportunity to present his case-in-chief regarding custody modification and was appropriately prohibited from re-litigating matters not presently before court, and prohibited from presenting cumulative evidence; (2) Father waived challenge to admissibility of therapist letters by not raising issue before trial court; moreover, court recognized that Father's actions in inappropriately sharing court records with Children necessitated sealing of therapist letter report; (3) Father did not raise substantial doubt about trial judge's ability to preside impartially; (4) court did not abuse its discretion in terminating Mother's obligation to use Soberlink alcohol monitoring device; (5) trial court considered and weighed all custody factors, including parties' history of alcohol and drug use; (6) court did not abuse its discretion in giving Mother opportunity to name third party for Children to contact if they are concerned

about her alcohol consumption; (7) court did not err in placing reduced weight on Children's preference given Father's routine alienating behavior; court noted that Children's *in camera* testimony exhibited desperate attempt to satisfy and please Father and forward his agenda; (8) court's credibility decisions were within its discretion; (9) trial court's findings of fact, including finding that Father engaged in alienating behavior, were supported by testimony from treating professionals; (10) order denying reconsideration was not reviewable on appeal; (11) Father engaged in contemptuous behavior volitionally and with wrongful intent, especially with respect to his interference with Children's therapy; (12) trial court based its decision on best interests of Children, not on ill will and bias toward Father; (13) court did not err in granting Mother sole legal custody because Father has demonstrated continuous interference with emotional and physical welfare of Children). Accordingly, we affirm based on the trial court's opinion, and direct the parties to attach a copy of the trial court's October 12, 2021 opinion to future filings involving this appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/2022

- 19 -

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

J████ F. D████                          :          NO. 2007-26322
      Plaintiff                           :
                                    :
                                    :
      v.                                    :
                                      :          1852 EDA 2021
M████ A. D████                          :
      Defendant                           :

## OPINION

Clifford, Daniel J.                                                 October 12, 2021

Appellant, J███ F. D███ files this appeal from the Order entered by the undersigned in this child custody matter dated August 10, 2021.

## FACTUAL AND PROCEDURAL HISTORY

Appellant is J███ F. D███ ("Father") and Appellee is M███ A. D███ ("Mother"). The parties have two daughters born during their marriage: B███ D███ (DOB: ███/2006) and P███ D███ (DOB: ███2008) (collectively referred to as "minor children"). The parties were married on December 30, 2005, separated on March 20, 2012 and officially divorced on September 13, 2018.

2007-26322-0603  10/12/2021 3:16 PM # 13283552
Rcpt#Z4148676 Fee:$0.00 Opinion
Main (Public)
MontCo Prothonotary

-1-

The parties have been embroiled in litigation for over a decade, covering most of the minor children's entire lives.[1] The parties are routinely heard on numerous pleadings including, but not limited to, Petitions to Modify, Petitions for Contempt, Emergency Petitions and Petitions for Protection from Abuse.[2]

It is worth noting that the instant matter tracks closely with the protracted custody proceedings conducted before the undersigned in 2017. At that time, on August 31, 2017, the Court issued comprehensive Findings of Fact consisting of twenty-two (22) pages with an accompanying Order of seventeen (17) Pages.[3]

The 2017 Order represented a significant change from joint legal and the 50/50 physical custody schedule the parties had been observing pursuant to a 2013 Order and highlighted significant concerns with regard to Father's behavior. The aforementioned 2017 Order provided Mother with sole legal custody and primary physical custody with Father having alternate weekends (Friday through Sunday) and one day during the week from 4-7 PM. Notably, the

---

[1]   In the case of P████, litigation has in fact spanned her entire life.

[2]   As noted in Footnote 3 of the undersigned's August 9, 2021 Findings of Fact:

> "To date, there are now a total of 567 docket entries (not including PFA's). The undersigned has presided over most of the Court proceedings between the parties since being assigned to the case in January 2016: eight and one half (8½) days of protracted custody hearings (including two sets of two individual *in camera* interviews), two (2) days of protracted support hearings, four (4) PFA hearings, proceedings relating to equitable distribution and contempt issues and a day and a half of equitable distribution hearings (plus numerous Short List proceedings related to all of the foregoing issues). The two (2) days of support proceedings in 2016 before the undersigned represented the third round of protracted support hearings over the previous three (3) years (there were a total of four (4) days of protracted hearings before two other Family Court Judges). Father has appealed numerous Order's to the Superior Court of Pennsylvania including a support appeal in 2015, a custody appeal in 2017, an equitable distribution appeal in 2018 and a PFA appeal in 2014. In any event, the undersigned has expended the equivalent of at least thirteen (13) days of protracted proceedings, plus countless other proceedings, with these parties in the past five and one-half (5 ½) years."

[3]   The Findings of Fact issued on August 10, 2021, the subject of this appeal, consisted of twenty-nine (29) pages with an accompanying Order of eighteen (18) pages.

undersigned warned that Father's continued efforts to isolate and turn the children against their own Mother were as if he was carefully planting the "seeds of alienation."[4]

Notwithstanding Father's behavior at that time to alienate the children from Mother, the undersigned noted the following:

> *"Father's role in the process [i.e. legal custody] can be resumed at some point in the future provided that there is demonstrated improvement on his ability to co-parent without the constant need to prove Mother wrong at each turn, imposing judgmental opinions that are not productive to the process, and thriving on producing conflict in the presence of third party professionals; all of which are not in the best interest of the children."*

*See* August 31, 2017 Order, Footnote 1.

Father appealed the undersigned's August 31, 2017 Order raising twelve (12) issues on appeal.[5] On June 13, 2018, the Superior Court of Pennsylvania affirmed the undersigned's Order holding that the undersigned's "opinion and findings of fact provide a careful and detailed examination of the evidence and a comprehensive analysis of each of the section 5328(a) custody factors and each of Father's claim on appeal."[6] Specifically, the Superior Court found that the undersigned's finding that Father's "pattern of conduct [was] symptomatic of parental alienation," was not without basis, and thus did not abuse its discretion.[7] The Superior Court also directed that the parties attach a copy of the undersigned's opinion in the event of further proceedings.[8]

---

[4]   *See* August 31, 2017 Findings of Fact, Pg. 21.

[5]   *See* October 23, 2017 Concise Statement of Errors. Notably, some of the issues raised in Father's 2017 Concise Statement of Errors are almost identical to the errors raised in the instant appeal.

[6]   *See* J.F.D. v. M.A.D., No. 3200 EDA 2017, 2018 WL 3045140 (Pa. Super. June 13, 2018).

[7]   *See Id.* The Superior Court noted in their decision that multiple professionals, including Dr. Bellettirie and Dr. Gerald Cook, found Father to be extremely controlling, arrogant, and exhibited narcissistic behaviors. The same pattern of behavior continues with an array of new professionals in the current round of litigation.

[8]   *See Id.*

-3-

Just as the Superior Court predicted that there would be future proceedings, the parties continued to heavily litigate, not only in custody, but also in Equitable Distribution, Protection from Abuse and other various motions and pleadings.[9]

On February 8, 2019, following an incident that occurred at the children's school where Mother's alcohol use was at issue, the undersigned ordered Mother to enroll in Soberlink, a remote alcohol monitoring program.[10] The Order was entered to ensure the safety of the children as it related to any allegation made regarding Mother's alcohol use and driving. The Soberlink program requires that the user designate a "concerned party," such that any requested changes to the program had to be signed off on by the concerned party. The program further required that there be "involved parties," such that all test results by the user would notify the involved parties. Mother designated her adult son, L███ V██████, as her "concerned party," and Father and the MCAP attorney, as the designated "involved parties."[11]

Thereafter, on or about March 2019, Mother and her concerned party requested that the Soberlink positive BAC threshold be raised from the default zero tolerance to a positive BAC threshold setting of 0.020% (based on her belief that the zero default setting was too sensitive and was providing inaccurate test results). Soberlink accommodated the request upon receiving the signed request forms from both Mother and her concerned party. When the changes were questioned by Father and his then attorney during the 2020 custody proceedings, in order to

---

[9] Notably absent from the custody pleadings filed by Father is the undersigned's 2017 Opinion (as directed by Superior Court).

[10] *See* February 8, 2019 Order.

[11] A volunteer attorney with the Montgomery Child Advocacy Project (MCAP) was appointed as a GAL for the children in the 2019 PFA matter. There have been numerous GAL's appointed in the approximate 15 PFA filings over the years.

-4-

ensure full disclosure and transparency, the undersigned entered an Order on February 24, 2020 detailing the aforementioned changes.[12]

Father subsequently agreed to a custody Order on that same date, February 24, 2020. The February 24, 2020 Order restored Father's joint legal custody, added an overnight on the Sunday of Father's alternate weekends and added an overnight visit during the week (an increase of 6 overnights a month overall). It also provided an avenue for Father to improve his co-parenting relationship such that a 50/50 physical custody schedule could resume at the beginning of the 2020-21 academic school year.[13] Notably, neither Father nor his legal counsel included in the Agreed Order any concern or request to change the BAC threshold back to a zero tolerance threshold.[14]

Father did not make any effort to improve the co-parenting relationship and instead, continued to chart his path of contentious litigation, leading to his October 9, 2020 Emergency Petition to Modify—the basis for the instant appeal. As opposed to working towards a 50/50 schedule, as anticipated, Father instead sought to effectively shut Mother out completely; requesting "full legal and 100% physical custody."[15]

Furthermore, in an ironic projection of his own faults and issues, Father alleged that it was Mother who is alienating the children from Father, that it was Mother who is creating conflict at every turn, and that it was Mother who is placing the children in "imminent danger".[16]

---

[12]   *See* February 24, 2020 Order.

[13]   *See* February 24, 2020 Agreed Order.

[14]   *See Id.* This point is extremely significant to Father's appeal as much of Father's entire focus in the 2021 proceedings was the Soberlink testing.

[15]   *See* Father's October 9, 2020 Emergency Petition to Modify.

[16]   *See Id.*

Consistent with Father's theme for total and full control, he requested that the minor children "have a break from Mother, [the] court, and its court-ordered professionals."[17]

On June 8, 2020, upon review of an Emergency Petition filed by Mother, the undersigned discovered that the therapy for the children, specifically directed in the 2017 Order, was not occurring and proceeded to enter an Order directing therapy to be resumed "forthwith."[18]

On October 19, 2020, upon learning from the minor children's therapist, Kristine Kershner, that neither of the children were attending therapy as previously ordered in the August 31, 2017 Order *and* June 8, 2020 Order, the undersigned proceeded to issue a Rule to Show Cause upon both parties to show why the Court should not find them in contempt.[19]

After Father filed his Emergency Petition to Modify on October 9, 2020, the parties appeared before the Honorable Carolyn Carluccio, the Administrative Judge of Family Court, for a Triage Conference on December 11, 2020 and were then scheduled for a two-day protracted hearing before the undersigned on February 2 and 3, 2021.[20] Both Rule's to Show Cause were also consolidated with Father's Emergency Petition to Modify for the two day protracted hearing.[21]

---

[17] *See Id.* As indicated throughout this Opinion, Father routinely recognizes himself as the one and only individual that can help and address the minor children's needs. Furthermore, despite his October 2020 Emergency Petition alleging the children had of all these problems, Father was busy sidelining the therapy both children were supposed to obtain pursuant to the undersigned's Court Orders.

[18] *See* June 8, 2020 Order. The Order provided that the Court considered therapy for the children to be essential, given the history of the case, and further directed the parties to cooperate with the children's therapy. Also, the Order specifically cautioned as to the implementation of sanctions, pursuant to 23 § 5323(g), should there be non-compliance.

[19] *See* October 19, 2020 Rule to Show Cause.

[20] *See* December 15, 2020 Order

[21] *See* January 15, 2021 Scheduling Order

-6-

Notably, the Scheduling Order entered by Judge Carluccio directed that *"[o]nly relevant evidence since the 2/24/20 Agreed Order shall be admitted into the trial."*[22] Despite the Order limiting the parties to relevant evidence post February 24, 2020, Father proceeded to submit proposed exhibits numbering close to 1,000 pages in the Court's "drop box".

The first day of hearings began on February 3, 2021.[23] The first half of the first day of testimony was directed to the children's therapist Kristine Kershner. In general, the therapist testified that the children were initially going to the scheduled appointments, but as soon as the alternating weekly summer schedule started in June with Father, they began to refuse attendance and Father did not bring them in for sessions.[24] Ms. Kershner clarified that the children's refusal to attend was due to their belief that they did not need to attend therapy anymore and that they "no longer trusted the therapist."[25] Additionally, Ms. Kershner testified to Exhibits "M-1" through "M-3" and conveyed the following:

> " ... [P▓▓] began re-attending consistently on June 5, 2020, upon order of the court. At that time, increased visitation began to occur with her father, with P▓▓ and her sister reportedly spending alternate weeks with her father. During this time, there was notable clinical change in P▓▓. She became increasingly resistant to attend therapy, stating that she no longer wanted to attend because therapy was causing her a great deal of stress. During session on 6/5/2020, 7/27/2020 and 8/13/2020 she indicates she wants to stop therapy. When asked to explain her reasons, she shares each time that therapy is very stressful because it is causing her parents to argue more. *She states her father does not want her to attend therapy and her mother does, as a result they fight...* In addition to this increased resistance to attending therapy, P▓▓ also began to exhibit an increase in negative attitude and behavior toward her mother. This was concerning, as P▓▓ had been working very hard to improve her relationship and communication with her mother prior to this. This had been a focus of her therapy, at her request..." [Emphasis added]

---

[22]  *See* December 11, 2020 Scheduling Order.

[23]  The first scheduled day for February 2, 2021 was continued due to the Courthouse closure.

[24]  *See* February 3, 2021 NOT at Pgs. 14-33.

[25]  *See Id.* at 15-21.

*See* Exhibit "M-2" of the certified record.

When it was Father's turn to elicit testimony, Father chose to spend much of his time questioning the therapist about the format of the therapy sessions and alleged communication between himself and the therapist.[26] In a clear demonstration of how Father continues to view litigation and accompanying therapy as a means to persuade the court and treating professionals that he is "the end all, be all" for the children's well-being, he stated the following:

> MR D█████: Is it true that P████ considers me to be the *singular parent* who genuinely thinks, cares, reflects on her issues and endeavors to understand them and to find ways for her to help soothe herself? [Emphasis added]
>
> Ms. KERSHNER: She has never told me that.
>
> MR. D█████: Would you be supervised if she has said those things?
>
> THE COURT: Therein lies the problem. Mark the tape please (to the Court Reporter).
>
> ...
>
> THE COURT: Mr. D█████, if your children have these issues that you've just stated, sexuality, bedwetting and eating, why in the world wouldn't you be pursuing them to have therapy with somebody even if it's not [Kristine Kershner]?
>
> THE COURT: You've never filed a Petition for either this therapist to be replaced or to hire a new one as far as I know. Your petitions are all directed to a change of the overall schedule for custody. They're not pertaining to what the children really need which is therapy. Why is that? Or are you just making these things up that they have these issues?
>
> MR. D█████: I'm not fabricating a single thing, Your Honor.
>
> THE COURT: All right. Then why wouldn't you pursue them to have therapy? Why would you sit by and just rest all of your chips in a petition to modify the custodial schedule hoping that you'll get primary custody and then what? Everything will be perfect and fine? There will be no problems?

---

[26] *See* February 3, 2021 NOT at Pgs. 47-105.

-8-

THE COURT: So I just want to make sure I understand your petition. Your petition to modify custody is that we'll modify custody so that you have full and complete control, full legal custody, full physical custody, and magically everything will be better, and we wouldn't need therapy; is that your testimony? Is that your position?

MR. D██████: Remove "magically" and, yes, that is my position.

*See* February 3, 2021 NOT at Pgs. 62; 66-69.

Father has steadfastly, if not stubbornly, maintained this pattern of behavior wherein he believes himself more capable of handling issues for the children despite what any court, therapist, or doctor provides. Just as Father exhibited his sense of entitlement and arrogance before Dr. Bellettirie and Dr. Cooke in the 2017 proceedings, Father has since continued to do so with new treating professionals.[27]

Dr. Donna Tonrey was appointed to provide co-parenting therapy for the parties in order to improve their co-parenting relationship on August 9, 2019 after a succession of several other notable mental health professionals in the region. In her letter report dated December 5, 2019 (entered to the record of the proceedings as Exhibit "C-6"):

> "After the overall experience, and in particular the last session with James on November 1, 2019, I do not believe that any amount of therapy or therapeutic interventions will make a difference with J████ cooperating with co-parenting. In my experience of working with J████ and M█████, J████ did not demonstrate a regard for the opinion, viewpoint, or authority of others involved in resolving this situation. Although J████ wrote in October 16, 2019 sessions as if he had intent on being effective at co-parenting, what he demonstrated in November 1, 2019 session, as well as prior sessions, was not in line with his written statement. From my experience in these sessions, I am not confident that J████ was intent on taking responsibly for the impact that his words and actions have on effective co-parenting. I do know both J████ and M█████ contribute to the situation, however, M█████ does appear to have a willingness to take responsibility for the impact her words and actions have on co-parenting."

*See* Exhibit "C-6" of the certified record.

---

[27]  *See* J.F.D. v. M.A.D., No. 3200 EDA 2017, *supra*, at *3.

Father has made it clear that any professional who disagrees with his perspective will either be bullied to the point of quitting, be fired, replaced, or can no longer be trusted.[28]

When it was Father's turn to testify following Ms. Kershner's testimony, considerable time was expended while Father went through the alleged missed Soberlink tests (walking though each month on Father's self-created Calendar Exhibit (*See* Exhibit "F-2" of the certified record), and providing Father ample time to give his version of Mother's "missed tests".[29]

Following the first day of testimony, Father continued his litigation strategy to wear down the court and opposing counsel with the additional filings of pleadings including a twenty-nine (29) page Motion in Limine (447 pages including attachments) and a sixty-eight (68) page "Statement in Lieu of Testimony" (374 pages including attachments). In both pleadings, Father sought to introduce essentially a full history of his version of the parties' lives both prior to the Agreed Order of February 24, 2020 and after. Specifically, Father attempted to use his Motion in Limine to introduce allegations of Mother's alcohol use prior to the Agreed Order of February 24, 2020; and use his "Statement in Lieu of Testimony" as an effort to put evidence into the record that he failed to testify about during the hearing.[30]

The undersigned scheduled the parties for a second day of testimony on March 15, 2021, consolidating Father's Motion in Limine. Following argument on the Motion in Limine, the undersigned took the Motion under advisement and Father was then directed to finish his direct testimony.[31] Instead, Father opted to use the time set aside for his direct to argue with the Court

---

[28]   See Exhibit "M-23"– list of professionals.

[29]   *See* February 3, 2021 NOT, *supra*, at Pgs. 121-240.

[30]   *See* Father's March 4, 2021 Motion in Limine; *See* Father's March 12, 2021 Statement in Lieu of Additional Oral Testimony.

[31]   *See* March 15, 2021 NOT at Pg. 42.

-10-

over the validity of admitting his voluminous "Statement in Lieu of Testimony."[32] Having cited no legal authority upon which to enter such a statement into the record, the undersigned denied Father's request.[33]

After some further redirection, Father finally resumed his direct testimony.[34] During his direct testimony Father repeatedly testified that he is the minor children's "first line of defense" and that he didn't feel it was necessary to reach out to the professionals when he credits himself as someone who can handle it on his own.[35] As indicated in the undersigned's August 31, 2021 Findings, Father showed a complete unwillingness to support therapy for children. On the contrary, he encouraged them not to participate, refused to transport them to scheduled therapy appointments during his custodial time and, worst of all, shared the contents of progress letters the therapists had provided to the Court with the children.[36] By sharing the contents of the therapist's letters, a self-serving and destructive act, Father successfully undermined any rapport that the therapists worked to build with the children, all the while convincing the children, over and over again, that the therapists cannot be trusted.

Father also remains oblivious that some of his conduct strains the relationship between the two minor children, an issue that P███ has admitted to the multiple therapists she has seen, as well as to the undersigned. This was exhibited when he was asked the following on cross examination:

> COUNSEL: Did B███ receive any award or recognition from the school for her performance?

---

[32] *See Id.* at Pgs. 46-63; 70-71.

[33] *See Id.* at 57.

[34] *See Id.* at 71-115.

[35] *See Id.* at 86.

[36] *See* August 31, 2021 Findings of Fact, Factor 7; *See also* Exhibits "M-1", "M-2", "M-3", and "C-11".

-11-

MR. D█████: Not from the school but from me.

COUNSEL: What do you mean from you?

MR. D█████: B███ lamented that she was not going to get recognition for all the hard work that she put into that school year, and she reasonably expected that she was going to receive recognition in front of her entire class...And so I had an award made that recognized and honored her for her achievement...I didn't want COVID to be the singular reason why she doesn't get the kind of recognition that the school was likely going to give *our daughters*. [emphasis added]

...

COUNSEL: Did P███ come to learn that you created an award and ordered it for B███ and did not do so – I mean did P███ come to learn that that came from you, the award for B███?

MR. D█████: I believe she did, yes. Yeah, I recall actually talking about it and letting P███ know that – I let P███ know that I wanted to recognize what B███ did, and I used this as a learning or a teaching moment for P███ that – you know, whose grades are not as close to B███'s...

...

THE COURT:...was there nothing that you could come up with that might provide some recognition to P███ whether or not she got twos or threes [for grades]? Was there some other type of thing that you could come up with for her?

MR. D████: Your Honor, I always recognize P███ for her achievements regardless of what they are.

THE COURT: But you didn't at year end, school end, for her from the sounds of it, or are we mistaken about that?

MR. D████: No, you're not mistaken. I didn't provide or – yeah, I didn't come up with an award for P███ because P███ was not lamenting over the absence of an award whereas B███ was.

THE COURT: Why would that matter? If you're giving one to one and not the other, why would it matter? If anything, if one person's complaining about not getting an award and the other one isn't, they both should not have gotten something...

*See* March 15, 2021 NOT Pgs. 124-131.

-12-

Father failed to comprehend that he was prioritizing B███'s feelings over P███'s and, at the same time, sending both children an incorrect message by "creating" a fake school award and pretending to both that it was a real one.

By the conclusion of the second scheduled day of testimony, Father had effectively been given one and a half days to testify, through both direct and cross examination.

Having still not heard any testimony from Mother, the undersigned scheduled a third day of testimony on May 17, 2021. In addition, the undersigned granted, in part, Father's Motion in Limine such that Father could present limited testimony/evidence concerning Mother's alleged substance abuse from January 1, 2019 to date (expanding the February 24, 2020 Agreed Order cutoff from the scheduling Order).[37] The undersigned also granted Father's request to have a representative from Soberlink testify and for the representative to provide Chambers with the entire file that Soberlink maintained for the parties matter.[38]

Recognizing the concurrent emotional and additional behavioral issues that the children were experiencing throughout this litigation, and the testimony from Ms. Kershner that it was not realistic for her to continue, the undersigned directed that the children begin therapy with Dr. Heather Green on March 22, 2021.[39] The four page March 22, 2021 Order appointing Dr. Green stated that she would not be replaced and also directed her to provide a written letter to Chambers regarding the status of therapy prior to May 3, 2021.[40]

---

[37] *See* March 22, 2021 Memorandum and Order.

[38] *See* March 18, 2021 Order. Father had previously attempted to admit into evidence documents and communications that he had compiled and claimed it was from Soberlink. However, given the edits that Father had made to the documents, the undersigned believed that it was prudent to obtain the entire "file" directly from Soberlink.

[39] *See* March 22, 2021 Order.

[40] *See Id.*

-13-

The undersigned also entered a separate six page Order on March 22, 2021 appointing additional mental health professionals to treat specific behavioral issues for each child as the parties had been paralyzed by indecision on the selection of professionals for many months.

Before the third day of testimony began, Father filed yet another Motion—a Motion for Reconsideration of the Motion in Limine—which was consolidated with the hearing on May 17, 2021.

Mother finally had her opportunity to testify on May 17, 2021. In sum, Mother testified to Father's refusal to follow court orders and how he allows the children to do what "they believe is right" as opposed to what a court order says.[41] Mother stated that it was her impression that Father instilled in the children that they have the choice to do what they want to do, instead of what Mother, the court, or any treating professional may tell them.[42] Father has gone to extensive effort to convince the children that they do not have to do what they are told so long as they "do what's right."[43] As further evidence of Father's disregard of Mother, the Court, and the treating professionals, on the February 23, 2021 CHOP Intake Questionnaire for B████ (admitted to the record as Exhibit "M-9") Father lied in reporting that documentation of the child's legal custody arrangements "[did] not apply."[44]

In contrast to Father's attitude toward the treating professionals, Mother testified that she has been working with therapists on how to better parent and what to do when the children become defiant and purport to be in charge.[45]

---

[41]  *See* May 17, 2021 NOT at Pgs. 31-37.

[42]  *See Id.*

[43]  *See Id.*

[44]  *See* Exhibit "M-9"; *See Also* March 15, 2021 NOT at Pgs. 208-215.

[45]  *See* May 17, 2021 NOT at Pgs. 32-33.

-14-

Finally, Mother provided her own Exhibit regarding the alleged missed Soberlink tests, with accompanying emails and supporting documentation, and testified that the alleged missed tests directly correlated to dates when the children were in Father's custody or were only missed by minutes (to which she followed up with a compliant test).[46] Mother showed that she had not failed *any* Soberlink tests since March 1, 2020, that the children are obsessed with the testing, and asserted that further use of the Soberlink device would continue to be destructive and unproductive.[47]

At the conclusion of the third day, the undersigned scheduled a fourth day of testimony to enable the representative from Soberlink to testify on June 8, 2021.[48]

On June 7, 2021 (one day before the scheduled fourth and final day of testimony), in typical fashion to remove anyone who disagrees with him, Father filed a "Petition for Special Declarative Relief and to Disqualify the Honorable Daniel J. Clifford". Father alleged that the undersigned was impartial and should be considered a material witness to the parties' case due to the undersigned's remarks that the Court was of the impression that the parties had entered into an agreement following the BAC threshold change in Mother's Soberlink program.[49] Notwithstanding Father's efforts to delay the conclusion of the proceedings, the June 8, 2021 date to allow the Soberlink representative to testify remained as scheduled and both Father and Mother's counsel had ample opportunity to ask questions.

As ordered, Soberlink also provided Chambers and the parties with their complete file, which was made of record as Exhibit "C-10."

---

[46]   *See* Exhibits "M-17" and "M-18"; *See also* May 17, 2021 NOT at Pgs. 122-133

[47]   *See* May 17, 2021 NOT at Pgs. 123; 140.

[48]   *See* May 25, 2021 Scheduling Order.

[49]   *See* June 7, 202021 Father's Petition for Special Declarative Relief and to Disqualify the Honorable Daniel J. Clifford.

-15-

Despite Father's fishing expedition to find fault in Mother's Soberlink tests, three things were notable from the testimony of the Soberlink representative: (1) The representative testified that while he recognized that tampering does happen from time to time, that has not happened in this case;[50] (2) Soberlink can identify and evaluate a series of positive tests to detect if the results have been compromised, but looking at the data, nothing appeared wrong with the results;[51] (3) on average, a Soberlink client would utilize the device for four months.[52] Mother had been using the Soberlink device for over two years, an extremely uncommon time period for any parent in a custody case according to the Soberlink representative.

At the conclusion of the Soberlink representative's testimony, Father and Mother's counsel were given an opportunity to present closing argument and directed to submit their own proposed findings with regard to the custody factors in Pa. C.S. § 5328(a) by June 23, 2021. The undersigned made arrangements for the child interviews to occur the next day, June 9, 2021, while the children were at school, in a neutral setting, via Zoom. The parties were directed to present areas of inquiry to address with the children to Chambers, in advance, to enable their participation in the interviews.

A complete review of the children's interviews was contained in the August 9, 2021 Findings of Fact. The children's preference during the interview was not "well-reasoned."[53] The children's behavior could best be described as a desperate effort to satisfy their Father's "agenda", excluding Mother and placing him as the martyr for the family's issues and

---

[50]   *See* June 8, 2021 NOT at Pg. 54.

[51]   *See Id.* at 67.

[52]   *See Id.* at 88-89.

[53]   *See* August 9, 2021 Findings of Fact, Factor 7; *See also* June 9, 2021 NOT, child interviews.

-16-

concerns.[54] As a result, the undersigned placed reduced weight on the children's testimony, especially in light of the inescapable alienation at play.[55]

On June 11, 2021, the undersigned denied Father's Motion for Reconsideration, filed on May 5, 2021. There was no need for additional testimony as Father was provided with ample time to present his case within the four days of hearings and, furthermore, he was given the opportunity to make closing argument and submit written Findings of Fact.[56] Lastly, having no basis in which the undersigned would be called as a "witness" in the matter, and thus lacking any foundation, Father's Petition for Declarative Relief and to Disqualify the Honorable Daniel J. Clifford was denied on June 16, 2021.

Within a month after the record closed, and before the undersigned could issue his August 9, 2021 Order and accompanying Findings of Fact, Father filed an Emergency Petition to Modify on July 6, 2021 and an Emergency Petition for Special Relief on July 22, 2021, repeating nearly identical allegations as had just been testified to during the four (4) days of testimony. While not of record on appeal, Father further evidenced his sense of entitlement in the proposed Order he attached whereby he requests, among other things, that Mother undertake Soberlink tests within 30 minutes of Father's request and failure to do so would be deemed a positive test result.[57]

---

[54] See Id.

[55] See Id.

[56] See Father's May 5, 2021 Motion for Reconsideration. Father specifically requested that the court reconsider the denial of his "Statement in Lieu of Testimony" or alternatively, permit additional time for his testimony and evidence than had already been given.

[57] Father has also filed two separate PFAs within the past month on August 31, 2021 and September 17, 2021. The August 31, 2021 PFA was denied after a hearing by the Honorable Rhonda Lee Daniele on September 8, 2021. The second PFA remains pending but the Temporary Order was denied by the undersigned.

-17-

On August 9, 2021, the undersigned issued comprehensive Findings of Fact consisting of twenty-nine (29) pages with an accompanying Order of eighteen (18) Pages.

Thereafter, Father proceeded to file an appeal to the undersigned's August 10, 2021 Order, with his Concise Statement of Errors filed on September 9, 2021.

## ISSUES

Pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i), Father raises the following issues in the Concise Statement:

1. Whether the trial court erred as a matter of law and/or committed an abuse of discretion by failing to fulfill its obligation and responsibility to create a complete record in a custody case so that a comprehensive review can be conducted on appeal as follows:
    a. By refusing to allow Father to submit into evidence the complete history of Mother's alcohol abuse so as to understand the severity of her problem;
    b. By refusing to allow Father to submit evidence and testimony he sought to introduce that was relevant to the issue of custody and not duplicative, including evidence pertaining to Mother's substance physical and emotional abuses of the children, from May 24, 2017 to February 24, 2020;
    c. By refusing to allow Father to submit evidence and testimony pertaining to 14 of the 16 custody factors, from February 24, 2020 to present, because Father's time for testimony and evidence expired according to the Court's artificial time clock;
    d. If time was truly of the essence, then the Trial Court erred when it precluded Father from submitting a written statement in lieu of oral testimony that would have been subject to cross-examination because the Trial Court's manufactured time restraints effectively rendered Father an unavailable witness pursuant to Pennsylvania Rule of Evidence 804;
    e. By limiting Father's questioning of the Soberlink witness and by refusing to admit both parties' communication with Soberlink, which would have disclosed Mother's frequent attempts to circumvent Soberlink procedures and deceive the Court; and
    f. By limiting Father from testifying on redirect after being cross examined by Mother's counsel and thereby, blocking Father's right to rehabilitate his testimony;

2. By taking the position, as the Trial Judge repeatedly stated on the record, that he "has presided over numerous protracted proceedings involving the parties over the past 5 years including, but not limited to Custody and PFA's (as recently as 2020 and 2019, respectively) and, as a result, is extremely aware of the cumulative

-18-

history of the case," which position essentially insulates the Trial Judge from appellate review because what is in the Trial Judge's memory is not part of the record. As a result, the Trial Court excluded relevant evidence occurring over more than four (4) years of the children's lives.

3. Whether the trial court erred as a matter of law and/or committed an abuse of discretion in relying on an ex parte letter submitted to the Court by the children's therapist, Dr. Green, without giving Father the opportunity to cross examine the therapist and/or even have access to the letter

4. Whether the trial court erred as a matter of law and/or committed an abuse of discretion in denying summarily Father's Petition for Declaratory Relief and to Disqualify the Trial Judge and that was docketed on June 7, 2021, especially when the record does not support the conclusion there was an agreement regarding Mother's unilateral alteration to the Soberlink Device threshold.

5. Whether the trial court erred as a matter of law and/or committed an abuse of discretion when it terminated Mother's obligation to continue to use the Soberlink Device, especially given the evidence of record that Mother unilaterally increased the threshold for alcohol detection making her negative tests meaningless and in so doing, ignored the children's safety.

6. Whether the trial court erred as a matter of law and/or committed an abuse of discretion when it failed to give considerable weight to Mother's alcohol abuse and thereby avoided analyzing factors that should have been given weighted consideration pursuant to 23 Pa. C.S.A § 5328(a).

7. Whether the trial court erred as a matter of law and/or committed an abuse of discretion in granting Mother the sole discretion to name a third party for the children to contact regarding Mother's drinking and driving, especially when the record was clear that Mother would name her adult son, and that Father had legitimate concerns about the adult son's ability to manage Mother's drinking.

8. Whether the trial court erred as a matter of law and/or committed an abuse of discretion in not asking the children critically relevant questions provided by Father to the Court as per its June 8, 2021 request, and in dismissing the credible concerns and reasonable preferences of the children.

9. Whether the trial court erred as a matter of law and/or committed an abuse of discretion in making credibility determination for Mother and Father that are not supported by the record and which appear to be a blatant attempt by the Trial Court to render its decision impervious to review on the issue of credibility alone.

10. Whether the trial court erred as a matter of law and/or committed an abuse of discretion in making numerous Findings of Fact that are not supported by the record, including but not limited to the finding that Father allegedly engaged in

-19-

conduct to alienate the children from Mother despite the abundance of evidence in the record that the children are estranged from Mother and want to reside with Father as a result of Mother's abuse of the children and her inability to function as a parent due to her alcohol abuse.

11. Whether the trial court erred as a matter of law and/or committed an abuse of discretion in denying Father's Motion for Reconsideration despite the Court's May 11, 2021 Order to hear arguments for the same.

12. Whether the trial court erred as a matter of law and/or committed an abuse of discretion in finding Father in contempt of the Orders dated June 8, 2020, the Agreed Order of February 24, 2020 and section 5(f) of the March 22, 2021, especially since Mother does not have clean hands with respect to the Orders of Custody and participation in therapy.

13. Whether the trial court erred as a matter of law and/or committed an abuse of discretion rendering a decision that is based on its ill will and bias towards Father, which is palpable in the record, rather than what is in the best interests of the children

14. Whether the trial court erred as a matter of law and/or committed an abuse of discretion in granting Mother sole legal custody of the children when the record is replete with incidents of Mother's poor judgement regarding the children, including but not limited to those occasions where Mother elected to consume alcohol in excess when with the children and to endanger the children's safety by driving a vehicle with the children inside after imbibing alcohol.

## STANDARD OF REVIEW

The issues set forth in Father's Concise Statement of Errors Complained of on Appeal, all of which pertain to abuse of discretion by the trial court, prompt the Superior Court to apply the following standard of review.

When making a decision on a petition to modify custody, "a court must conduct a thorough analysis of the best interests of the child based on the relevant Section 5328(a) factors."[58] 23 Pa.C.S. § 5328(a) factors to be considered include the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

---

[58] *See* A.V. v. S.T., 87 A.3d 818, 822 (Pa. Super. 2014), *citing* E.D. v. M.P., 33 A.3d 73, 80 (Pa. Super. 2011).

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor."

23 Pa. C.S. § 5328(a)(1-16).

All factors listed pursuant to § 5328(a) must be considered when entering a custody Order and shall be delineated on the record, in open court, or in a written opinion or order.[59] In expressing the reasons for its decision, the trial court is only required to explain that the enumerated factors were considered and the custody decision is based on those considerations.[60]

In reviewing a custody order, the reviewing court's scope "is of the broadest type and [the] standard is abuse of discretion."[61] The reviewing court "must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations."[62] Because the reviewing court cannot make independent factual determinations, it must "defer to the trial judge regarding credibility and the weight of the evidence. The trial judge's deductions or inferences form its factual findings; however, do not bind [the reviewing court]. [It] may reject the trial court's conclusions only if they involve an error of law or are unreasonable in light of its factual findings."[63]

Furthermore, a court may exercise its power to hold an individual in civil contempt to enforce compliance with its order but not to inflict punishment.[64] The contempt power is

---

[59]   *See* A.V. v. S.T., *supra*, at 822-823.

[60]   *See Id.* at 823.

[61]   *See* V.B. v. J.E.B., 55 A.3d 1193, 1197 (Pa. Super. 2012).

[62]   *See Id.*

[63]   *See* C.A.J. v. D.S.M., 136 A.3d 504, 506 (Pa. Super 2016), *citing* S.W.D. v. S.A.R., 96 A.3d 396, 400 (pa. Super. 2014).

[64]   *See* Sinaiko v. Sinaiko, 644 A.2d 1005, 1009 (Pa. Super. 1995).

-22-

essential to the preservation of the court's authority and prevents the administration of justice from falling into disrepute.[65]

When considering an appeal from an Order holding a party in contempt for failure to comply with a custody order, the scope of review by the appellate court is narrow and will only reverse upon a showing of abuse of discretion.[66] Abuse of discretion is found if the court misapplies the law or exercises its discretion in a manner lacking reason.[67] However, the reviewing court must place great reliance on the sound discretion of the trial judge when reviewing an order of contempt.[68]

## ANALYSIS

It is worth noting that Father's five-page Concise Statement raises fourteen (14) challenges to the Court Order of August 10, 2021.[69] The approach to appellate advocacy embarked on by Father brings to mind the words of Justices Ruggero J. Aldisert and Robert H. Jackson:

> "With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to *any* of them ... [and] it is [this] presumption ... that reduces the effectiveness of appellate advocacy."

---

[65] *See* Garr v. Peters, 773 A.2d 183, 189 (Pa. Super. 2001).

[66] *See* Hopkins v. Byes, A.2d 654, 656 (Pa. Super 2008).

[67] *See Id.*

[68] *See* Lachat, *supra* at 487-88.

[69] Father's Concise Statement related to instant appeal is in similar fashion to his Concise Statement previously filed in his appeal of the undersigned's Custody Order of August 31, 2017. Therein, Father raised *twelve* (12) challenges to the trial court's Custody Order (which the Superior Court ultimately affirmed on June 13, 2018).

-23-

Aldisert, "The Appellate Bar: Professional Competence and Professional Responsibility – A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982) (emphasis in original).

> "Legal contentions, like the currency, depreciate through overissue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at a lack of confidence in any one. Of course, I have not forgotten the reluctance with which a lawyer abandons even the weakest point lest it prove alluring to the same kind of judge. But experience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one."

Jackson, "Advocacy Before the United States Supreme Court," 37 Cornell L.Q. 1, 5 (1951).

Though oft quoted by the judiciary, these passages tend to "ring true," as demonstrated by the numerous issues raised by Father in the within appeal, as well as in his previous 2017 custody appeal. Nonetheless, the Court has attempted to ascertain the gravamen within each of Father's issues in the within Opinion.

I.      The Trial Court Made a Comprehensive Record Consisting of Four days of Testimony, *In Camera* Interviews of the Children and Nearly 50 Trial Exhibits Providing Father Ample Opportunity to Present his Case on a Modification of the 2020 Agreed Order

In Father's first error complained of, and its six (6) subparts, Father alleges that the trial court abused its discretion by not "allowing" Father to submit certain evidence and testimony so that the trial court could maintain a complete and comprehensive record for review.

"In all civil litigation, the trial judge possesses broad power and discretion to control the course of the trial. [Citation omitted] While every litigant is 'entitled to a fair and impartial

-24-

trial... that does not mean that a trial judge must be a 'mere moderator.'"[70] Furthermore, "the admission or rejection of rebuttal evidence is within the sound discretion of the trial judge."[71]

In line with the trial court's authority to control the course of trial, litigants may not relitigate issues that have been established prior to an agreed order, absent a showing of fraud or mutual mistake that may have induced the litigant to enter the agreed order.[72] This is especially true in child custody cases where parents often desire to re-litigate past transgressions from many years ago while our family courts are confronted with an enormous docket, backlogs and with court time precious.[73]

As exhibited throughout the trial, numerous pleadings, and in his Concise Statement of Errors, Father effectively sought to introduce evidence of the complete history of the parties' custody matter, despite having just entered into an Agreed Order on February 24, 2020 only seven months prior to his modification petition *and* a Scheduling Order directing the limitation of evidence from February 24, 2020 forward. Father further sought to introduce a Mt. Everest sized pile of documents and exhibits purportedly related to the custody factors through his "Statement in Lieu of Testimony" and his Motion in Limine (instead of providing evidence and testimony within his case-in-chief).

Not once did Father allege that he was fraudulently induced into the 2020 Agreed Order or that it was a result of mutual mistake such that he would be allowed to re-litigate issues prior

---

[70]   *See* Daddona v. Thind, 891 A.2d 786, 800 (Pa. Cmwlth Ct. 2006).

[71]   *See* Mapp v. Dube, 479.A2d 553, 557 (Pa. Super. 1984)

[72]   *See* D.M v. V.B., 87 A.3d 323, 328 (Pa. Super. 2014) (Finding that the appellant, having entered into an agreed support order, could not relitigate the issue of paternity absent a showing of fraud or mutual mistake inducing the appellant to entered into the agreed Order.)

[73]   It is worth noting the enormous attention provided to this child custody case during the past year including, but not limited to, four days of testimony, *in camera* interviews and numerous Orders, all during a time period of a judicial emergency due to the COVID-19 pandemic..

-25-

to the February 24, 2020 Agreed Order. In fact, on the contrary, Father actually acknowledged in his testimony that he had *"prudent reason to come to an agreement with the understanding that we would revisit in six months..."*[74] Thus, Father lacks any legal basis upon which to claim that he was prejudiced from providing his extensive amounts of evidence prior to the February 24, 2020 Agreed Order, having already considered the issues upon which Father made his agreement. Nonetheless, the undersigned still proceeded to grant Father's Motion in Limine, in part, and permitted Father to introduce limited evidence/testimony concerning Mother's alleged alcohol use from January 2019 forward (a full year prior to the February 24, 2020 Agreed Order evidence cut-off *and* contrary to the terms of Judge Carluccio's Scheduling Order).[75]

With that backdrop, it is the trial court's conclusion that Father was given ample opportunity to present his-case in-chief.[76]

Even so, Father still attempts to distort the record as not being complete or comprehensive in light of four and a half (4 ½) days of testimony and nearly 50 trial exhibits. Father's alleges that he was not allowed to present certain evidence with regard to Mother's alleged substance physical, and emotional abuse. Father further claims that the record is not complete due to the Court's denial of his "Statement in Lieu of Testimony" and not admitting Father's compilation of personal communications to and from Soberlink.

As noted, *supra*, the trial court has broad power to limit the course of trial, including but not limited to, the limitation of cumulative evidence being presented for issues that were addressed prior to an agreed order. Even though Father was appropriately limited to the

---

[74] *See* March 15, 2021 NOT at Pg. 41.

[75] *See* March 22, 2021 Memorandum and Order.

[76] *See* February 3, 2021 NOT and March 15, 2021 NOT, generally.

-26-

introduction of evidence after the February 24, 2020 Agreed Order for his case-in-chief, Father was still given upwards of two (2) full days to elicit testimony on what he believed was important to proving his case. Upon review of his testimony, Father chose instead to primarily focus on Mother's alleged alcohol abuse.[77] When it appeared that Father used up much of his time arguing over the inadmissibility of evidence and not addressing other pertinent factors, he sought to introduce a 68-Page "Statement in Lieu of Testimony" (374 pages including attachments). Having no such legal basis to enter such a pleading into the record of the proceedings, the undersigned denied Father's request to have the document introduced as "evidence."[78]

In the overall, Father was given ample time to question the children's treating therapist with regard to the children's therapy, to testify to his own version of events that transpired from February 24, 2020 forward, and to question the Soberlink representative (on whether Mother was, in fact, circumventing the device). However, in large part, Father presented inadmissible questions that amounted to *inter alia*, leading questions, inadmissible hearsay, and questions irrelevant to the instant custody matter before the court.[79] Mother's counsel, Joanna Furia, Esquire, also timely and concisely raised objections to Father's inadmissible questions. It is clear from the record that such questions were properly suppressed pursuant the Pennsylvania Rules of Civil Procedure.

Father simply attempted to control the entire Court proceeding to the length of his testimony and the introduction of thousands of pages of cumulative, irrelevant, and

[77] Notably, while Father represented himself during the protracted hearings, at times, the undersigned attempted to guide his inadmissible questions and statements so as to permit him to elicit an appropriate response.

[78] As a self-represented litigant, Father is bound by the same rules and procedures as a represented party. The undersigned is not aware of any other legal proceeding wherein an attorney or litigant would be permitted to introduce such a document as evidence in lieu of actual testimony.

[79] *See* February 3, 2021 NOT and March 15, 2021 NOT, generally.

-27-

foundationally lacking evidence. Had the undersigned permitted every piece of evidence that Father sought to admit, and permitted Father to filibuster with several more days of testimony, the undersigned would have delegated its authority to Father (relegating itself as a "mere moderator" where the matter would never reach the point of completion). Therefore, this Court did not abuse its discretion and created a comprehensive and complete record such that a comprehensive review can be conducted on appeal.

## II. The Trial Court has the Authority to Control its Courtroom and Limit Testimony Appropriately

In his second error complained of, Father alleges that the trial court abused its discretion by excluding evidence over the past four (4) years, recognizing that the undersigned was extremely aware of the cumulative history of the case. Father claims that it is because of the undersigned's awareness that certain evidence was excluded.

This issue is thoroughly addressed in the analysis of Section I, *supra* such that it should not be necessary to repeat here for the reader.

However, for further completeness, the Superior Court has recognized, through both the Rules of Civil Procedure and accompanying case law, that a trial court does not abuse its discretion when it limits the cumulative testimony and evidence before the court by way of time constraints.[80] In Lafferty, appellant raised issue with the time constraints the trial court placed on his case during trial, contending that he was only limited to one (1) hour of testimony.[81] The Superior Court found that Pa R.C.P 223(1) provides the trial court with "broad power and discretion to limit the number of witnesses whose testimony is similar or cumulative as well as

---

[80] *See* Lafferty v. Ferris, No. 1131 MDA 2016, No. 1619 MDA 2016, 2017 WL 4180000. *7 (Pa. Super. Sep. 21, 2017).

[81] *See Id.*

-28-

any cumulative evidence presented to a jury."[82] Pursuant to such Rule, the Superior Court reasoned that the trial court had the authority to restrain the testimony, as the appellant already had a full days' worth of testimony and the trial court had still not heard from the opposing party.[83] Having had ample time to present his case and presenting testimony that appeared to be duplicative, the Superior Court held that the trial court did not abuse its discretion by restricting the appellant's testimony to one additional hour after having a full day to testify.[84]

Here, Father asserts a nearly identical issue in that he was restrained from presenting cumulative evidence over the past four (4) years after being provided with nearly two (2) full days to testify. Similar to Lafferty, the undersigned restrained Father from overwhelming the record with copious amounts of cumulative evidence such that the record would not be inundated with testimony and evidence that had already been given or addressed in prior Orders. In fact, much of Father's proposed evidence hindered on being duplicative of alcohol abuse allegations that have been previously addressed in separate Orders throughout the years. However, unlike Lafferty, Father was essentially given the equivalent of two (2) full days of testimony before finally hearing testimony from Mother (as opposed to the (1) day in Lafferty). The undersigned appropriately limited Father's testimony and evidence such that he would be restrained from providing similar or cumulative evidence and to allow for sufficient time for Mother to present her case.

Thus, the undersigned did not abuse its discretion by not permitting Father to present cumulative or similar evidence during the time allotted.

---

[82]  See Id.

[83]  See Id. at *8.

[84]  See Id.

## III. All Therapist Letters Relied upon by the Trial Court Were Made of Record without Objection from Father

In his third error complained of, Father alleges that the trial court abused its discretion in relying on therapist letters provided to the Court by Dr. Heather Green and allegedly not giving Father the opportunity to cross examine the therapist and the letters provided of record.

It is well settled that to preserve an objection for appeal, the objection must be raised before the trial court.[85] Litigants effectively waive an issue by not properly raising it before the trial court.[86]

Here, Father raises issue, *for the first time*, with the admission of the therapist letters from Dr. Green (admitted into the record as Exhibit "C-5," Exhibit "C-9," and Exhibit "C-11"). Thus, Father's third error should be deemed waived as it was not properly objected to on the record.

Notwithstanding Father's wavier of this issue, Father has a history of inappropriately sharing court records and documents with the minor children. Father's inappropriate behavior necessitated the sealing of Dr. Green's June 28, 2021 letter report as it was disclosed that Father had been sharing with the children how the hearing was going and what Dr. Green's letter reports had disclosed about the progress of the children. Notably, the prior two update letters from Dr. Green, dated May 13, 2021 and June 6, 2021, were admitted of record, provided to Father as Exhibit "C-5" and Exhibit "C-9" respectively, and not objected to.

[85] *See* Tecce v. Hally, 106 A.3d 728, 732 (Pa. Super. 2014), *citing* Green v. Green, 69 A.3d 282, 288 (Pa. Super. 2013); Pa. R.A.P. 302(a).

[86] *See* Green v. Green, 69 A.3d 282, 288 (Pa. Super. 2013), *citing* Summers v. Summers, 35 A.3d 786, 790 (Pa. Super. 2012).

-30-

As evidenced by Dr. Green's June 28, 2021 letter report (admitted and sealed post-hearing as Exhibit "C-11"), the children accused the therapist of misrepresenting their progress to the court as their "Father had showed [them] the reports Dr. Green submitting [sic] to the Court."[87] Thus, in an attempt to rebuild the trust that Father had destroyed, the undersigned directed in the August 9, 2021 Order that Dr. Green no longer issue a written report to the parents (but may communicate directly with the parties).[88] Furthermore, Father was specifically directed to not share the Findings accompanying the August 9, 2021 Order or any other legal document with the children in order to preserve the children's relationship with the treating professionals.[89]

Accordingly, Father's third error complained of should be deemed waived for failure to object to the admission of Dr. Green's progress letters on the record. Furthermore, the Court did not abuse its discretion in sealing the June 28, 2021 letter from Father given the inappropriate and ongoing history of Father sharing legal documents and therapist updates with the children and to protect the children's relationship with their treating professional.[90]

## IV. Father's Petition to Disqualify the Undersigned was Made without any Legal or Factual Basis

In his fourth error complained of, Father alleges that the trial court abused its discretion by denying Father's Petition for Declaratory Relief and to Disqualify the Trial Judge.

---

[87] See Exhibit "C-11". The children's comments represent an all too familiar refrain that has been routinely taken by Father in his manipulation of treating professionals.

[88] See August 9, 2021 Order

[89] As noted in the August 9, 2021 Findings of Fact, there had been a musical chairs rotation of mental health professionals appointed by the undersigned in the case due to Father's manipulative behavior.

[90] It should be noted that Father's inappropriate sharing of legal documents, and thereafter questioning the children of its contents, also necessitated the sealing of the children's *in camera* interview transcripts. Father has not raised this issue in this appeal and thus it should be deemed "waived". Notwithstanding the waiver, Father has since filed a motion with the trial court to unseal the transcript on September 23, 2021 (well past the deadline for appeal).

-31-

The standards for recusal are well established such that it is "the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises substantial doubt as to the jurist's ability to preside impartially."[91]

Furthermore, the Pennsylvania Supreme Court has established the following:

> "...we will [not] permit a party who is dissatisfied with the progress of the trial mid-stream to arbitrarily attempt to cause the disqualification of the presiding judge. Judge shopping has been universally condemned, and will not be tolerated at any stage of the proceedings. Thus, *where fabricated, frivolous or scurrilous charges are raised against the presiding judge during the course of the proceeding, the court may summarily dismiss those objections without hearing where the judge is satisfied that the complaint is wholly without foundation.* In such case the complaining party may assign the accusation as a basis for post-trial relief and, if necessary, a record can be developed at that stage and in that context. Where, as here, a judge concludes that the allegations justify an evidentiary hearing in which he will testify, it then becomes incumbent upon that judge to step aside for the appointment of another judge to hear and rule upon the issue of disqualification." [emphasis added]
>
> *See Id.* at 208-209, *citing* Mun. Publications, Inc. v. Ct. of Com. Pleas of Philadelphia County, 489 A.2d 1286, 1287 (1985)

Here, the undersigned dismissed Father's motion without a hearing as a result of the motion wholly lacking any foundation. The undersigned had simply referenced a prior Order relating to the Soberlink program on the record, not in the capacity as a witness at an evidentiary hearing nor to make a credibility determination.[92]

Father rests his motion on the conjecture that the undersigned somehow is a "material witness" due to the undersigned's statements on the record that there was an agreement between the parties following the recalibration of the Soberlink device. However, pursuant to Com v. Dip and the Supreme Court's standards, the undersigned was not making such statements in the capacity as a witness, but rather to clarify the extensive pleadings and procedure in this matter.

---

[91] *See* Com. v. Dip., 221 A.3d 201, 206 (Pa. Super. 2019), *citing* Com. v. Abu-Jamal, 720 A.2d 79, 89 (1998).

[92] *See* February 3, 2021 NOT at Pgs. 134-142

-32-

In addition, the Court specifically directed the testimony of a representative from Soberlink, and to produce their entire file, to ensure that both parties, particularly Father, had ample opportunity to address any inconsistencies. Father's motion was merely another attempt to distort the record and arbitrarily disqualify the undersigned as he was dissatisfied in how the trial was proceeding after his own two days of testimony.[93] While Father did not necessarily 'agree' to the Soberlink recalibration, he was absolutely given notice of the adjustments, both through his counsel and the Order of February 24, 2020. In addition, Father and his then legal counsel proceeded to agree to the entry of an Agreed Custody Order *on the same day*, without raising or including any provisions for another recalibration of the device.

As indicated throughout his numerous filings, Father's disdain and lack of respect for the Court is profoundly apparent. In this filing, he simply sought to disqualify the undersigned at the proverbial "twelfth hour" and following multiple days of testimony. This was yet another attempt to maintain full control in how the proceedings would unfold (presumably, if granted, resulting in a whole new multiple day trial with different judge).[94]

Accordingly, the court did not abuse its discretion in summarily denying Father's Motion to Disqualify.

V.  **Father has Created a Hyper Obsession with the Soberlink Device and has Weaponized the Device Despite Mother's Compliance for Over Two and a Half Years**

---

[93]  The court reiterates that this has been a pattern of Father's behavior for full control and to remove anyone who disagrees with his perspective.

[94]  As if to further prove the point, the minor children confirmed to Dr. Green that Father told them that the trial "wasn't going well." *See* Exhibit "C-9."

-33-

In Father's fifth error complained of, Father alleges that the trial court abused its discretion when it terminated Mother's obligation to use the Soberlink device and thus disregarded the children's safety. Notably, Father raised a similar issue on appeal in his October 23, 2017 Concise Statement of Errors to the undersigned's August 31, 2017 Order prior to the implementation of the Soberlink device in 2019 (with respect to Mother's alleged alcohol abuse and safety of the children).

The undersigned reiterates that an abuse of discretion is only found when the trial court's conclusions are not supported by competent evidence on the record or unreasonable in light of the factual findings.[95]

As indicated in both the Findings and the prior 2017 Opinion, the undersigned has taken appropriate and immediate measures to address Father's allegations of alcohol abuse. As a result of the 2019 PFA, the parties entered into an Agreed Order whereby Mother would utilize the Soberlink alcohol monitoring device prior to and during her custody time periods. As testified to by the representative from Soberlink, clients on average use the device for 4 months to provide assurance to the other parent and/or the Court, after which the device is no longer required.[96] However, leading up to the 2021 hearings, Mother had maintained use of the Soberlink device for over two and a half years, creating a hyper obsession in both the children and Father over use of the device.

The record well established that Mother's use of the Soberlink device has since disrupted any efforts to have a peaceful observance of Mother's custodial time and has been weaponized to achieve Father's goal of total autonomy over both Mother and the children. Evidence of such weaponization was clear from the testimony that the children and Father request that Mother use

---

[95] See V.B. v. J.E.B., supra, at 1197; See Also See C.A.J. v. D.S.M., supra, at 506.

[96] See June 8, 2021 NOT at Pg. 52.

the device "on demand" simply when the minor children feel that Mother's demeanor has changed.[97] If Mother does not comply or acts different in any way, Father is immediately notified by the children and within minutes he appears to pick the children up "as if responding to a five-alarm fire." This has even occurred during the late hours of the night, when the children should be asleep in bed, and at events when other family members have been present to address any concern the children may have had.[98]

As in 2017, and continuing to present, Father repeatedly relies on feedback supposedly conveyed from the minor children to him. Even after multiple therapists concluding that it is not the children's responsibility "to collect evidence" on Mother's alcohol use, and that they are not of the age, maturity, or position to accurately report such behavior, they continue to do so knowing that, if they do, they will obtain Father's approval and he will pick them up.

Despite the obsession, Mother has never had a DUI, never had any indication that alcohol use has affected her work performance, nor that alcohol use affects her daily routines or relationships. In fact, since using the Soberlink device, Mother has complied with a staggering number of 1276 tests and has not failed one test since the February 24, 2020 Agreed Order.[99] While still recognizing the 2019 incident at the school as a mistake in judgment, Mother has remained remorseful and apologetic.

The undersigned has spent considerable effort addressing this issue throughout the years and has gone to substantial lengths to ensure transparency concerning the Soberlink device (including, but not limited to, the February 8, 2019 Order; the December 17, 2019 Order; the

---

[97] *See* February 3, 2021 NOT at Pgs. 204-231

[98] *See Id.*

[99] *See* Exhibit "C-10"; Exhibit "M-17"; and Exhibit "M-18". Father insists that this is a result of Mother changing the calibration from zero tolerance to a threshold of .02. While not an expert in Blood Alcohol Content readings, it appears that even registering compliance between 0 and .02 would not substantially impair an individual to the extent that the children's welfare would be in danger.

-35-

February 24, 2020 Order; the granting of Father's Motion in Limine (in part); and ensuring the testimony directly from a Soberlink representative). Therefore, the Court did not abuse its discretion in concluding that Mother does not suffer from a substance abuse issue, such that there was a genuine risk of the children's safety, and appropriately proceeded to remove the use of the Soberlink device.

**VI.    The Trial Court Appropriately and Thoroughly Analyzed All Custody Factors in its twenty-nine (29) page August 10, 2021 Findings of Fact, Including the History of Drug and Alcohol Abuse**

In his sixth error complained of, Father alleges that the trial court abused its discretion by not giving considerable weight to Mother's alleged alcohol abuse and thereby not analyzing the custody factors pursuant to Section 5328(a) appropriately.

The consideration of Mother's alleged alcohol abuse and the court's analyzation thereof was thoroughly addressed in Section V., *supra*.

However, for further completeness, the Court did issue a comprehensive Findings of Fact consisting of twenty-nine (29) pages with an accompanying Order of eighteen (19) Pages addressing each of the custody factors completely. Just as the Superior Court found in Father's 2017 appeal to the undersigned's August 31, 2017 Order, the undersigned's "opinion and findings of fact provide a careful and detailed examination of the evidence and a comprehensive analysis of each of the section 5328(a) custody factors and each of Father's claim on appeal."[100]

---

[100]   *See* J.F.D. v. M.A.D., No. 3200 EDA 2017, *supra*.

Furthermore, this Court must again stress its concern over Father's continued reliance upon the minor children's observations as indisputable facts; in doing so, he only further illuminates his attempts to alienate the minor children from Mother by reinforcing and validating their perception as reality.[101]

Therefore, the Court properly analyzed each custody factor pursuant to Section 5328(a), including the consideration of Factor 14 relating to alcohol abuse, and did not abuse its discretion.

## VII. Father's Incessant Need to Control Mother's Decision Making and Further Disrupt Mother's Custodial Time has Been Made of Record Throughout Many Years of Litigation

In his seventh error complained of, Father claims that the trial court abused its discretion in granting Mother the opportunity, in the August 9, 2021 Order, to name a third party for the children to contact if they are concerned about Mother's alleged intoxication.[102]

Notably, in Father's Concise Statement of Errors, he once again attempts to mischaracterize and distort the record by stating that the purpose of Section 27. of the undersigned's August 9, 2021 Order was for the named third party to "manage Mother's

---

[101] It also bears noting that the undersigned's August 9, 2021 Order did address any future concern on the issue with the inclusion of Section 27. whereby:

"Within 2 days of the date of this Order, Mother's Counsel shall inform Chambers as to the designation of a third party adult to serve as a contact for the children. In the event the children are concerned about being safely transported in a vehicle driven by Mother, they shall contact the third party. If the children contact Father instead of the third party, Father is directed to contact the third party. Father is not authorized to pick up the children from Mother's custody *unless specifically agreed upon with Mother or the third party.* The third party may be a friend, relative or neighbor and is not subject to Father's approval. The third party shall execute, and file of record, the Acknowledgement attached hereto and made part hereof as Exhibit "A".

[102] *See* Footnote 98, *supra.*

-37-

drinking."[103] At no point in the Order does the undersigned direct a third party to "manage Mother's drinking".

The purpose of the provision was for the third party to assess whether Mother is, in fact, intoxicated such that she could not safely drive the children due to Father's allegations that Mother is intoxicated based solely on information from the minor children (even after passing a Soberlink test). Thus, instead of relying on the perceptions of the 12 and 14 year old children, an adult could step in and assess the situation. It is no surprise to this Court that Father wanted the children to report to him and him alone for any suspicions of Mother's intoxication. The Order seeks to remove Father entirely from the situation as he has repeatedly misused the process originally intended by the use of Soberlink.

Furthermore, Father's concerns about Mother's adult son, L████, are not credible. During the prior round of child interviews in 2017, the children indicated a love for their step-brother L████. L████ has been a constant presence in the children's lives and, despite his age difference, has periodically lived with Mother and the children.

In the most recent child interview, P████ maintained that she still loves L████. However, she also recounted an incident of "sibling rough-housing" spawning the PFA filed by Father in February 2, 2017 (4 years ago, when P████ would have been 8), claiming that she now believes it was abuse. P████'s statement could only be described as revisionist history emanating from Father, as both children were due to participate in L████'s upcoming wedding (and, further, P████ never mentioned this to the undersigned in the 2017 *in camera* interview).

Finally, Father's complaint that Mother was given sole discretion to choose a third party was necessary given Father's constant interference with the Court and treating professionals, his

___

[103] *See* August 9, 2021 order.

-38-

non-compliance with Court Orders and his all-consuming need to assert total control over Mother and the children's lives. Father seeks to have Mother report to Father, on demand, if the children suspect she is intoxicated (and further limit the decision making and input from Mother unless Father consents).[104] However, as the therapists have advised the children, it is not their role to constantly monitor Mother, "collect evidence," and report to Father their perception of Mother's alleged intoxication.[105] Father maintains an inability to rely on the authority of anyone that is not himself, especially if they disagree with his position or recounting of events.

Thus, the Court did not abuse its discretion in ordering Mother to name a third party, without the approval of Father, for the children to contact if they were concerned about Mother's ability to safely transport them in a vehicle as an additional safeguard.

VIII. **Father has Maintained Clear Efforts to Undermine any Professional Help for the Children to the Extent That He Has Influenced the Children's Decisions and Preferences**

In his eighth error complained of, Father alleges that the trial Court abused its discretion by not asking the questions that Father provided to Chambers for the *in camera* interviews and ultimately dismissing the preferences of the children.

At first glance, the trial court is deeply concerned with Father's statement that the undersigned did not ask the questions Father provided, as the trial court rhetorically asks: "How would Father know?" The undersigned sealed the transcripts of the child interviews as Father has exhibited a history of sharing court related documents with the children and confronting them with what they have stated. Despite the undersigned's precaution to protect the children, it

---

[104]  *See* Father's Proposed Order within his Pre-Trial Statement.

[105]  *See* Exhibit "C-11".

appears Father inappropriately "grilled" the children about their interviews, even without having access to the transcript (even further basis upon which the transcripts should remain sealed).

"It is within the trial court's purview as the finder of fact to determine which enumerated best interest factors are most salient and critical in each particular child custody case."[106] In addition, "[a]lthough a child's wishes are important, they are not controlling in custody matters, and the child's preference, to be given credence, must be based on reasons which comport with his [her] best interests, whether or not he [she] is able to identify them as such."[107]

Here, the court placed reduced weight on the children's preference as Father has routinely influenced the children by way of his alienating behavior. Specifically, as addressed, *supra*, throughout this Opinion, Father's theme has been to maintain total and complete control over the children's lives by way of holding himself above all treating professionals and even the Court. This has been routinely evidenced from the revolving door of appointed counselors and therapists, whereby the undersigned has been compelled to repeatedly replace due to Father interfering with the process:

(1) Ms. Krystiane Cooper, appointed April 2017 and terminated due to Father's interference;

(2) Ms. Kristine Kershner, appointed September 2019 and terminated after Father undermined the sessions by telling the children they could not trust the therapist and no longer needed therapy;[108]

(3) Dr. Heather Green, appointed March 2021 and Father has already made attempts to have the children believe they cannot trust Dr. Green;[109]

---

[106] *See* M.J.M. v. M.L.G., 63 A.3d 331, 339 (Pa. Super. Ct. 2013).

[107] *See* Watters v. Watters, 757 A.2d 966, 969 (Pa. Super. Ct. 2000).

[108] *See* February NOT at Pg. 42

[109] *See* Exhibit "C-11"

-40-

(4) Dr. Gerald Belletirie, appointed as co-parenting counselor and terminated after Father attempted to use the sessions to forward his own agenda and not improve the co-parent relationship;[110]

(5) Dr. Donna Tonrey, appointed in August 2019 and terminated after concluding that Father could not demonstrate a regard for the opinion and authority of other's involved to resolve the situation.[111]

Father instills the impression in the children that all the treating professionals have "gotten it wrong" or have "betrayed their confidences", especially if they find any fault with Father.[112] When any of the professionals have attempted to address the issues to help the children, Father claims that they are just "echoing the same false narratives" instead of recognizing that he, himself, is part of the greater problem.[113] When the therapists report to the Court that Father is a source of the children's issues, he inappropriately shares that information with the children such that they feel "cornered" and have the need to defend Father as a "good person."

This was made clear during P████'s *in camera* interview when she repeatedly called Mother a bad person, requested to be with Father 100%, and claimed to not like the two prior therapists because they had "lied to her." P████ went even further to state that she could not even trust the undersigned because he allegedly believes that her "dad is a bad person." When asked to clarify, she stated that, if the undersigned thought that Father was a great person and Mother a bad person, she would be with Father 100%. As described in the August 9, 2021 Findings, P████ exhibited a desperate attempt to satisfy and please her Father and/or complete his agenda.[114]

---

[110] *See* August 31, 2017 Findings of Fact

[111] *See* Exhibit "C-6."

[112] *See* March 15, 2021 NOT at Pgs. 164-167.

[113] *See Id.* at 167-68.

[114] This was further emphasized due to P████ being clearly aware that Father favors B████ over her. *See* August 9, 2021 Findings of Fact, Factor 7.

-41-

2007-26322-0603 Opinion, Page 42

Furthermore, the children have clearly parroted Father's claims that their Mother is an alcoholic, despite being subject to an alcohol monitoring device for over two and a half years. Even during the late hours of the night, or when at family functions, the children feel the need to constantly monitor Mother and report back to Father. The children unreasonably place their assessment of Mother's intoxication level higher than what the results of an alcohol monitoring device may provide (which is then reinforced when Father comes to their "rescue").

To be clear, the undersigned did not entirely dismiss the concerns of the children and reasonably asked relevant questions of the children during the *in camera* interviews. However, the overwhelming evidence of Father's routine interference and alienating behavior necessitated placing a reduced weight on the children's "concerns and requests."

Thus, the Court did not abuse its discretion by reducing the weight of the children's preferences and appropriately asked relevant questions during the *in camera* interview based on the undersigned's many years of Family Court experience and training.

## IX. The Trial Court's Credibility Determinations are Supported By the Record

In Father's ninth error complained of, Father alleges that the trial Court abused its discretion in making credibility determinations for Mother and Father that are not supported by the record.

Just as the Superior Court found in its Opinion on Father's prior custody appeal in 2017, "...knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record."[115] Specifically on issues concerning credibility and weight, the Superior Court defers to the trial court as they have had

---

[115] *See* M.A.D v. J.D.F, *supra*, No. 3200 EDA 2017, *citing* Ketterer v. Seifert, 902 A.2d 553, 540 (Pa. Super. 2006) (quoting Jackson v. Beck, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

-42-

the opportunity to observe the proceedings and demeanor of the witnesses.[116] The Superior Court has reasoned that:

> "The parties cannot dictate the amount of weight the trial court places on the evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion."

Here, the undersigned has had the responsibility of handling the enormous number of Court proceedings generated from this family over the past 6 years. This includes the following:

> "Eight and one half (8½) days of protracted custody hearings (including two sets of two individual *in camera* interviews), two (2) days of protracted support hearings, four (4) PFA hearings, proceedings relating to equitable distribution and contempt issues and a day and a half of equitable distribution hearings (plus numerous Short List proceedings related to all of the foregoing issues). The two (2) days of support proceedings in 2016 before the undersigned represented the third round of protracted support hearings over the previous three (3) years (there were a total of four (4) days of protracted hearings before two other Family Court Judges)."

*See* August 9, 2021 Findings of Fact, Footnote 1.

Even to date, the parties are once again scheduled before the undersigned for another protracted custody hearing on October 27, 2021 to address Father's Answer and Counterclaim filed on August 23, 2021 and Mother's Petition for Contempt filed on September 7, 2021.[117] Notwithstanding the ongoing and never ending filings, the undersigned has had the better of 6 years of ongoing litigation to assess the parties' credibility.

Furthermore, in the current round subject to this appeal, the undersigned spent considerable time making careful and thorough considerations in the best interest of the children

---

[116] *See Id., citing* R.M.G., Jr. v. F.M.G., 986 A.2d 1234, 1237 (Pa. Super. 2009).

[117] Post-hearing, Father filed an Emergency Petition to Modify on June 6, 2021. Mother then filed an Emergency Petition for Contempt on June 6, 2021 when Father withheld the children. Mother ultimately withdrew her Emergency Petition for contempt, after the undersigned directed the assistance of law enforcement, but not before Father filed an Answer and Counterclaim for contempt on August 23, 2021. Father also filed an Emergency Petition for special relief on June 22, 2021.

-43-

through four and a half (4 ½) days of protracted hearings, child interviews of both children, seven (7) separate interim Orders and ultimately a twenty-nine (29) page Findings of Fact and an eighteen (18) page final Order.

Thus, just as the Superior Court noted in its 2017 Opinion, "appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough."[118] Here, the trial has gone through extraordinary lengths to address this matter and properly assess credibility throughout the many years of litigation.

Accordingly, the undersigned did not abuse its discretion in making its credibility determinations.

## X.  Father Has Continued to Engage in Alienating Behavior Which the Undersigned Predicted in its August 31, 2017 Findings of Fact

In Father's tenth error complained of, Father claims that the trial court abused its discretion by making Findings of Fact not supported by the record, including the Finding that Father engaged in conduct to alienate the children from Mother.

A trial Court's finding on parental alienation shall not be disturbed when there is evidence to support such a finding.[119] The trial Court is within its authority to base its findings on record evidence that overwhelmingly demonstrates a parent's continued alienating behavior such that it has had a negative impact on the children.[120] The Superior Court has recognized supporting evidence for parent alienation when the record is replete with supporting testimony from treating professionals.[121]

---

[118] See I.F.D. v. M.A.D., *supra*, at *3.

[119] See A.L.B. v. M.D.L., 239 A.3d 142, 151 (Pa. Super. 2020).

[120] See B.E. v. D.N., No. 1894 EDA 2013, 2014 WL 10937475, at *7 (Pa. Super. April 9, 2014).

[121] See Id.

In B.E. v. D.N., the mother raised issue with the court's findings with respect to Section 5328(a)(8): the attempt of a parent to turn the child against the other parent. The trial court found that the mother had not only attempted to do so, but had been successful in turning the children against the father.[122] Testimony from Dr. Steven Cohen, who had been appointed to provide goal-oriented therapy for the family, provided that the mother had been very uncooperative in scheduling therapy sessions and exhibited a fundamental difference in how the parties should parent the children.[123] Specifically, the mother believed that the children should decide what they want to do while the father believed that the parents should work together to decide what was best for the children.[124] Furthermore, the mother had prevented the father from properly exercising his custodial time such that the father had to negotiate his custody time on a month to month basis. Ultimately, the Superior Court upheld the trial courts findings in that it was not an abuse of discretion.[125]

The Superior Court has also recognized support for the finding of parental alienation when there is testimony that one parent speaks with the children about financial matters, as leverage and a means to alienate the children from the other parent. In A.L.B. v. M.D.L, the father took issue with the trial court's findings that he used his "financial stronghold on the children and the mother to further alienate the children from the mother."[126] The court found that the father, in sharing financial issues that were more proper topics for discussion between the mother and the father, exhibited parental alienation and was clearly supported by record

---

[122] See Id. at *6.

[123] See Id.

[124] See Id.

[125] See Id. at *7.

[126] See A.L.B. v. M.D.L, supra, at 147.

testimony. Thus, the Superior Court held that the father's claim necessarily failed, as there was record support that the father was inappropriately sharing financial information to further alienate the children.[127]

Here, the facts could not be any clearer that Father has exhibited behaviors in not only attempting to, but in succeeding to alienate the children from Mother. Similar to B.E. v. D.N., Father has actively obstructed the therapeutic process such that he has allowed the children to refuse attendance and advised them that they do not need therapy.[128] As noted *supra*, the record is filled with evidence of Father's interference with any therapeutic intervention for himself or the children.[129] Father's position has been to go so far as stating that all problems would stop for the children once he is awarded sole legal and sole physical custody.[130] Father believes that his version of the children's opinion of what they want should outweigh what Mother, or any treating professional or even the Court believes would be best.[131]

Notwithstanding the extraordinary efforts that Father has gone to convince the children that they can do what they want to do, at the pinnacle of Father's alienation efforts remains that he has successfully removed every single Court appointed professional to solidify his total and full control.[132]

If that were not enough, Father routinely convinces the children that their Mother is an alcoholic by relying on their observations of what they believe an intoxicated person looks

---

[127] *See Id.* at 151.

[128] *See* Exhibits "M-1", "M-2", "M-3" and "C-11".

[129] *See* Section VIII, *supra*.

[130] *See* February 3, 2021 NOT at Pgs. 62; 66-69.

[131] *See* June 9, 2021 NOT, Interview of ▓ D▓ at Pg. 17-19.

[132] *See* Section VIII, *supra*.

-46-

like.[133] As noted *supra*, Father has essentially "enlisted" the children to monitor and "collect evidence" of their Mother's behavior, so that the instant they *feel* that she is intoxicated, they can notify Father to pick them up. [emphasis added]

Similar to A.L.D., Father also inappropriately shared financial information and the costs of therapy, creating conflict within the children as to whether they should attend therapy or not.[134] Finally, Father has inappropriately shared Court documents and therapist progress updates with the children to further alienate the children from Mother (and undermine therapy).[135] Father effectively uses this information to pressure the children that what they told therapists, in private sessions, were not "the truth." It is this kind of behavior that the court has recognized as efforts to turn the children against the other parent, such that the children cannot trust anyone other than the alienator himself. As Father maintains through all of the proceedings and has demonstrated by an inability to comply with Court Orders, he holds himself above all others.

Thus, the Court did not abuse its discretion as the finding that Father alienated the children from Mother in its Findings, was supported by the record.

## XI. Father's Motion for Reconsideration was Without Legal or Factual Basis and Not Reviewable for Appeal.

In Father's eleventh error complained of, Father claims that the trial court abused its discretion in denying Father's Motion for Reconsideration.

---

[133]  *See* Section V and VII, *supra*.

[134]  *See* May 17, 2021 NOT at Pg. 27; *See Also* Exhibits "M-2"

[135]  *See* Exhibit "C-9" and "C-11".

-47-

The Superior Court has held that an order denying reconsideration is unreviewable on appeal.[136] Furthermore, there exists no abuse of discretion by the trial court in denying the underlying Motion, when the trial court carefully considers the substance of the pleading.[137]

First and foremost, Father's Motion for Reconsideration is not reviewable on appeal and should be summarily rejected by the Superior Court.

However, for completeness, the trial court did carefully consider the underlying Motion in Limine (the subject of Father's Motion for Reconsideration), even to the extent that Father's Motion in Limine was actually granted in part. Father sought to introduce thousands of pages of documents dating from before the parties February 24, 2020 Agreed Order. Much of Father's "evidence" was of questionable relevance as Father had not brought any of this evidence up prior to entering into the February 24, 2020 Agreed Order. Furthermore, the scheduling Judge had already limited the introduction of Father's evidence to post February 24, 2020.

Thus, the court did not abuse its discretion in only granting Father's Motion in Limine in part, and the Superior Court should dismiss Father's eleventh claim of error as not an issue properly before the reviewing Court.

XII.  **Father's Contempt was Done Volitionally and with Wrongful Intent as Exhibited by his Continued Interference to Have the Children Receive Professional Help**

In Father's twelfth error complained of, Father claims that the trial Court abused its discretion in finding Father in contempt of the June 8, 2020 Order, the February 24, 2020 Order and the March 22, 2021 Order.

---

[136]  *See* Bollard & Associates. Inc. v. H &R Industries. Inc., 161 A.3d 254, 256 (Pa. Super. 2017), *citing* Huntington Nat. Bank v. K-Cor, Inc., 107 A.3d 783, 787 (Pa. Super. 2014).

[137]  *See* Huntington Nat. Bank v. K-Cor, Inc., 107 A.3d 783, 787 (Pa. Super. 2014).

Father's contemptuous behavior, as exhibited by his parental alienation efforts, were thoroughly addressed in Sections VIII and X, *supra*, such that it should not be necessary to repeat here again for the reader.

However, for completeness, the undersigned notes that, to be punished for contempt, there must be a showing that: (1) the contemnor had notice of the specific order alleged to have been violated; (2) the act was volitional; and (3) the contemnor acted with wrongful intent.[138] Finally, to be punished for contempt, the underlying Order that was violated must have been "definite, clear and specific" so as to leave no doubt or uncertainty in the mind of the contemnor or the prohibited conduct.[139]

When considering an appeal from an Order holding a party in contempt for failure to comply with a custody order, the scope of review by the appellate court is narrow and will only be reversed upon a showing of abuse of discretion.[140] Abuse of discretion is found if the court misapplies the law or exercises its discretion in a manner lacking reason.[141] However, the reviewing court must place great reliance on the sound discretion of the trial judge when reviewing an order of contempt.[142]

Here, the facts were clear from the testimony and evidence that Father's acts were volitional and done with wrongful intent. Furthermore, Father had notice of the clear and specific language of Order, for the children to attend therapy, so that there was no uncertainty on

---

[138] *See* Lacahat, *supra*, at 489.

[139] *See Id.*

[140] *See* Hopkins v. Byes, A.2d 654, 656 (Pa. Super 2008).

[141] *See Id.*

[142] *See* Lachat, *supra* at 487-88.

what needed to happen.[143] The June 8, 2020 Order even explicitly referenced the statute related to custody contempt and possible sanctions.[144]

As indicated, *supra*, the children's therapist, Ms. Kershner, testified that the children expressed a distrust with the therapist, refused to attend, and were most hesitant about therapy in weeks following custody with Father.[145] Furthermore, the evidence demonstrated that Father had clearly interfered with therapy so pervasively that all progress in the therapy sessions had effectively come to a stop.[146] The children were supplied with information from Father to lead them to believe that they could no longer trust the therapist because she allegedly "hates her dad."

A strikingly identical situation was presented with Dr. Green during the trial itself when the children were attending therapy. Namely, the children were improving within therapy up and until Father shared the progress updates with the children.[147] This ultimately led to the children refusing attendance; being forced by Father to choose their allegiance to Father over what they told their therapist.[148] Father effectively destroyed therapeutic intervention by convincing the children that what they had said to the therapist could not have been true because it did not comport with his perspective and agenda.

---

[143] *See* June 8, 2020, February 24, 2020 and March 22, 2021 Orders. Each Order outlines exactly the kind of issues that needed to be addressed and directing prompt compliance.

[144] *See* June 8, 2020 Order, Section F.

[145] *See* February 3, 2021 NOT at Pgs. 15-36.

[146] *See* Exhibits "M-1" and "M-2".

[147] *See* Exhibit "C-11".

[148] *See Id.*

-50-

At the pinnacle of Father's contempt, and further evidence thereof, is his belief that the children wouldn't need therapy if he was given full and complete control.[149] Father has not been supportive of the therapeutic process because it is his belief that all therapists have lied, gotten it wrong, and has then convinced the children of the same.[150] Therefore, it was not abuse of discretion to find father in contempt of the Orders as his actions demonstrated direct contempt of the Court's Orders.

## XIII. The Thorough Findings of Fact Accompanying the August 10, 2021 Order Indicate the Extensive Basis for Which the Undersigned Made his Decision

In Father's thirteenth error complained of, Father alleges that the court abused its discretion in basing its decision upon ill will and bias towards Father, rather than the best interests of the children.

For the sake of brevity, this issue was thoroughly addressed in Sections IV, VIII, IX, and X, *supra* such that it should not be necessary to repeat again here for the reader.

Furthermore, the Court provided an extensive twenty-nine (29) page Findings of Fact, which properly analyzed each of the Section 5328 custody factors to base its decision upon.

Merely disagreeing with the findings and opinion of the Court does not mean the decision was based on ill will and bias. Thus, the trial court did not abuse its discretion by basing its decision on the careful consideration of the Section 5328 custody factors and did not render its decision via bias and ill will as Father alleges.

---

[149] *See* February 3, 2021 NOT at Pg.69.

[150] *See* March 15, 2021 NOT at Pg. 166-167.

-51-

## XIV. Father's Legal Custody Was Properly Removed Again Due to His Continued Interference with the Emotional and Physical Welfare of the Children

In his final claim of error, Father alleges that the trial court abused its discretion in granting Mother with sole legal custody.

Not only was this issue and the basis for such decision expressly addressed within the Court's Findings of Fact, but it has also thoroughly been addressed in the within Opinion in Sections V, VI, VIII, IX, and X, *supra* such that it should not be necessary to repeat again here for the reader.

However, for completeness, evidence of Father's interference was undeniable when he sought to exclude Mother from treatment for B███ at CHOP. As noted *supra*, Ms. Kershner had testified to some of the behavioral issues that the children were facing prior to the hearing. Despite recognizing the issues as an urgent problem, by the time the March 15th hearing occurred, the parents had still not reached a consensus on the selection of specialist to treat children. Nevertheless, Father testified that he went ahead and pursued treatment for B███ at CHOP to the exclusion of Mother *despite the fact that joint legal custody was restored in the Agreed Order of February 2020.* Not only did Father not include Mother with the CHOP visits, he specifically prevented her from providing any input to CHOP with regard to B███'s treatment.

The February 23, 2021 CHOP Questionnaire, Exhibit "M-9", eleven pages, was completed by Father and specifically excluded Mother and misled CHOP. Knowing full well that there was an Agreed Order for joint legal custody, entered barely a year prior, Father lied on the Questionnaire, including one of the Questions which asked the following:

> "A child under 14 years of age must be accompanied by a legal guardian or the accompanying parent must provide documentation of the legal guardian's consent to the evaluation. **If there are other legal custody arrangements, please**

-52-

provide legal documentation at your first visit or attach it to the end of this questionnaire".

Father responded: "Does not apply". [Emphasis added]

Further on the Questionnaire, Father trashes Mother with the following statements:

> "In the past four years, therapy has been counterproductive and even destructive. B███'s Mother, M█████ D███, was providing false information to the child therapists".

> "I have since learned that B███'s mother has a pattern of abusing alcohol, prescription medications and recreational drugs.

As if manipulating and misrepresentations to medical professionals is not enough, Father's approach to joint legal custody can best be summarized by his email to Mother of January 5, 2021, submitted as Exhibit "M-7", as follows:

> "Please confirm by 12p tomorrow that you will no longer actively participate in any medical specialist visit for the girls (re: OCD, tics, eating, sexual, etc.), indefinitely, otherwise I will contact CHOP legal department and advise that they do not have my consent for you to schedule or attend any appointment within the CHOP network. If I don't get the confirmation from you, I'll do the same with UPenn."

The email was thoroughly addressed at the March 15th hearing:

> THE COURT: I entered an Order in 2017 providing her [M█████] with sole legal custody for medical because of all the, for lack of a better word ---I'll borrow Joanna's for a minute ---bickering with medical professionals. And then last year that was reinstated for you. And so, not even a year later we're back to the bickering with medical professionals, and we're back to I think an inappropriate statement on your part that she agree to your demands that she not participate or you'll withhold consent for the child to get treatment. I mean is this a parent getting an "A"? I don't see that. You need to really try to explain why you would threaten M█████ that she not participate in her child's health appointment and that, secondarily, if she refused to, even though she has joint legal custody [and primary physical custody] you would withhold treatment. Whose interests are being put first here: Your daughters or you?
>
> MR D███: Let me answer those in reverse. I never withheld treatment.
>
> THE COURT: I'm just mystified, I guess, that's the best word, maybe flabbergasted. I don't know, that after four years or maybe three of having given

-53-

M████ sole legal custody for medical, basically within a year of getting it back, you're sending an email like this, which I would call a "slash and burn" email with quotes around it –Joanna didn't but I will – that's a "slash and burn" email… your way to co-parent is to demand that she not participate, and if she doesn't [agree], you withhold consent. I don't understand that.

MR. D████: Right. And you're not going to understand it without a lot more information to be presented.

THE COURT: Look we created a format for your daughter through the therapy. You made sure that didn't happen. You didn't like the therapist. You didn't like what they were saying and now we're moving over into the medical realm, and probably the same thing is going to happen again. Do you really believe that M████ as the mother of your daughter should have no input with the medical professionals? Even you had input when M████ had primary [legal] custody. Even you had input. You're saying she shouldn't have any.

MR. D████: That's arguable, but I don't want to go down that path right now.

*See* March 15, 2021 NOT Pgs. 179-185

The most recent impasse over the selection of specialists, and Father's unilateral actions, led to the entry of a six (6) page Memorandum and Order on March 22, 2021 in which the undersigned proceeded to appoint professionals. An additional five (5) page Order was also entered on March 22, 2021 replacing the children's Court appointed therapist Kristine Kershner with Dr. Heather Green.[151]

Thus, trial court did not abuse its discretion in granting Mother sole legal custody of the children.

---

[151] Section 5.f. of the March 22nd Order pertaining to Dr. Green specifically provided as follows: "*The sessions are not optional to the children. The parents are accountable to the Court for the refusal by either child to cooperate and participate. The Court reserves the right to impose sanctions promptly in the event either parent is not able to ensure compliance with this provision.*"

## CONCLUSION

For the reasons set forth above, this Court respectfully requests the Court Order of August 10, 2021 be affirmed.

BY THE COURT:

DANIEL J. CLIFFORD, J.

Copies sent via Prothonotary to:
J███ F. D███, *Pro Se*
Joanna M. Furia, Esquire

Copies sent via Chambers to:
Court Administration – Family (*Interoffice*)

Judicial Assistant